DAVID C. SHONKA
Acting General Counsel

CHRIS M. COUILLOU
      ccouillou@ftc.gov
DAMA J. BROWN
      dbrown1@ftc.gov
Federal Trade Commission
225 Peachtree Street, N.E., Suite 1500
Atlanta, Georgia  30303
(404) 656-1353 (Couillou)
(404) 656-1361 (Brown)
(404) 656-1379 (Facsimile)

DAVID C. FIX
      dfix@ftc.gov
Federal Trade Commission
600 Pennsylvania Avenue, N.W., H-238
Washington, D.C.  20580
(202) 326-3298 (Fix)
(202) 326-3395 (Facsimile)

THOMAS J. SYTA, California Bar #116285
      tsyta@ftc.gov
Federal Trade Commission
10877 Wilshire Boulevard, Suite 700
Los Angeles, California  90024
(310) 824-4324 (Syta)
(310) 824-4380 (Facsimile)

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                    Plaintiff,<br><br>          vs.<br><br>BURNLOUNGE, INC.,  ET AL,<br><br>                    Defendants. | Case No.: CV 07-3654 GW FMOx<br><br>Plaintiff Federal Trade Commission's Response to Defendants' Proposed Findings of Fact and Conclusions of Law |

# Table of Contents

I.    Introduction ...................................................................................... 1

II.   Plaintiff's Response to Defendants' Proposed Findings and Conclusions ..... 1

  A.   Understanding the BurnLounge Compensation Program ...................... 1

  B.   Defendants Failed to Prove their Packages Had Consumable Value ............ 4

  C.   Plaintiff Is Not Obligated to Show that Every Single Mogul Joined
       BurnLounge Exclusively to Participate In the Business Opportunity ........... 8

  D.   Defendants Assertion that Participants Were Active Moguls for Only 40
       Percent of the Company's Life Span Is Unsupportable and Irrelevant ........ 10

  E.   Defendants Other Misstatements and Irrelevant Assertions ........................ 11

    1.   Defendants Future Plans are Irrelevant ..................................... 11

    2.   Generalize Comparisons to Other MLMs Are Irrelevant ......................... 12

    3.   Defendants Waived Defense of Reliance on Advice of Counsel ............... 12

    4.   Defendants Misstated the Operability of Its Systems ............................... 13

    5.   "Get Rich Quick" Testimony Would Be Irrelevant ................................. 14

III.  The Evidence Proved that Plaintiff is Entitled to Prevail on Its Claims ...... 15

  A.   Defendants' Operated an Unlawful Pyramid Scheme ................................. 15

    1.   Plaintiff Applied Proper Legal Standard for Pyramid Analysis ............... 15

    2.   Defendants Distort the Reasoning of *Koscot* ...................................... 18

  B.   Defendants' Used False Statements to Promote Their Pyramid .................. 19

  C.   Defendants' Omissions ............................................................................ 21

  D.   The FTC's Claims Are Not Defeated by Affirmative Defenses .................. 22

IV.  Relief Requested .................................................................................... 22

  A.   Individual Liability .................................................................................. 23

  B.  Monetary Equivalent of Rescission ......................................................... 24

  C.   Disgorgement ......................................................................................... 27

# Table of Authorities

**Statutes**

Section 13(b), Federal Trade Commission Act, 15 U.S.C. § 53(b)... 1, 8, 23, 24, 27, 28

Section 5(a), Federal Trade Commission Act, 15 U.S.C. § 45(a) .......... 1, 20, 21, 22

**Cases**

*FTC v. Amy Travel Service, Inc.*, 875 F.2d 564 (7th Cir. 1989)............................. 14

*FTC v. Arlington Press, Inc.*, 1999-1 Trade Cas. (CCH) ¶ 72,415 (C.D. Ca. 1999) ............................................................................................................. 20

*FTC v. Febre*, 128 F.3d at 535 ................................................................ 29

*FTC v. Figgie Inter'l, Inc.*, 994 F.2d 595 (9th Cir. 1993)............................. 10, 15

*FTC v. Freecom Communications, Inc.*, 401 F.3d 1192 (10th Cir. 2005).............. 27

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) ........................... 24, 26

*FTC v. Inter'l Diamond Corp.*, 1983-82 Trade Cas. (CCH) ¶ 65, 725 at 69,709 (N.D. Ca. 1983) ................................................................ 9, 23, 25

*FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282 (D. Minn. 1988) ............. 9, 24, 25

*FTC v. Medicor, LLC*, 217 F. Supp. 2d 1048 (C.D. Ca. 2002)............................ 28

*FTC v. Pantron*, 33 F.3d 1088 (9th Cir. 1994) ........................................ 21, 22, 28

*FTC v. Publishing Clearing House, Inc.*, 104 F. 3d 1168 (9th Cir. 1997) ....... 23, 24

*FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312,  (8th Cir. 1991) .. 9, 23, 24, 25

FTC v. Solomon Trading Co., Inc., 1994 WL 421478, at *5 (D. Ariz. 1994) . 24, 25

*FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982)............................ 23

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984)............................ 23

*FTC v. World Media Brokers*, 415 F.3d 758 (7th Cir.2006) ............................... 23

*FTC v. World Travel Vacation Brokers*, 861 F.2d 1020 (7th Cir. 1988)................ 23

*SEC v. Great Lakes Equities*, 775 F. Supp. 211 (E.D. Mich. 1991)...................... 28

*Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204 (2002)............ 22, 27

*Harris Trust and Sav. Bank v. Salmon Smith Barney, Inc.,* 530 U.S. 238 (2000.). 27

*In re Cliffdale Assocs., Inc.,* 103 F.T.C. 110 (1994)................................ 20

*In re Five Star Auto Club, Inc.,* 97 F. Supp. 2d 502 (S.D.N.Y. 2000)............. 20, 21

*In re Koscot Interplanetary, Inc.,* 86 F.T.C. 1106 ............ 5, 8, 15, 16, 17, 18, 19, 20

*McGregor v. Chierico,* 206 F. 3d 1378 (11th Cir.2000)............................. 26

*Nat'l Dynamics Corp. v. FTC,* 492 F.2d 1333 (2nd Cir. 1974) ...................... 20

*Nelson v. Serwold,* 576 F.2d 1332 (9th Cir.)...................................... 24

*Randall v. Loftsgaarden,* 478 U.S. 647 (1986)...................................... 24

*SEC v. Benson,* 657 F. Supp. 1122, 1134 (S.D.N.Y. 1987)............................ 28

*SEC v. Blavin,* 760 F.2d 706 (6th Cir. 1985) .................................... 28

*SEC v. First City Financial Corp.,* 890 F.2d 1215 (D.C. Cir. 1989) ............... 29

*SEC v. Huffman,* 996 F.2d 800 (5th Cir. 1993)................................... 28

*Turner v. FTC,* 580 F.2d 701 (D.C. Cir. 1978)...................................... 8

*Virginia R. Co. v. System Federation,* 300 U.S. 515 (1937)........................ 23

*Webster v. Omnitrition Inter'l, Inc.,* 79 F.3d 776 (9th Cir. 1996) ... 15, 16, 18, 19, 20

**Other Authorities**

2 Dan B. Dobbs, *Law of Remedies § 9.3(3)(1993)* ................................. 24

8 Wigmore, *Evidence* § 2327, p. 636 (McNaughton rev. 1961)....................... 13

## I.    Introduction

The evidence at trial proved that Defendants engaged in unfair and deceptive practices as described in Plaintiff's Complaint.  (Dkt. #001.)  Defendants violated Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), by promoting an unlawful pyramid scheme, using false or misleading income claims and failing to disclose, when soliciting consumers to join the BurnLounge business opportunity, that most participants were not likely to earn substantial income. Pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Plaintiff asks the Court to enjoin Defendants BurnLounge, Inc., Juan "Alex" Arnold, Rob DeBoer and John Taylor from further law violations and to order ancillary monetary relief.

## II.   Plaintiff's Response to Defendants' Proposed Findings and Conclusions

A detailed statement of facts can be found in Plaintiff's Proposed Findings of Fact and Conclusions of Law (PFF, Dkt. #395) and is not duplicated here.  This brief responds to statements in Defendants' Proposed Findings of Fact and Conclusions of Law (DFF, Dkt. #396) that are misstated, irrelevant or erroneous.

### A.    Understanding the BurnLounge Compensation Program

To fully comprehend the claims and defenses of this action, a thorough understanding of the BurnLounge compensation program is needed.  (*See* PFF ¶¶ 10-44.)  Crucial to that understanding is the recognition that: 1) not all

BurnLounge moguls could earn cash income, and 2) not all BurnLounge moguls were treated identically under the BurnLounge compensation program.

Moguls were not automatically entitled to receive their earnings in cash. First they had to become "qualified." The purchaser of a basic, exclusive or VIP package paid $6.95 per month to become a mogul. (PFF ¶¶ 10, 14.) However, to become "qualified" to receive cash, moguls had to first sell two exclusive or VIP packages, two albums per month and – in the case of *basic moguls only* – sell at least $500 worth of music to non-moguls. (Ex. 8, §§ 6.1.4-6.1.5; PFF ¶ 19.)

Qualified moguls were not treated identically under the BurnLounge compensation program. All qualified moguls could earn similar concentric retail and product package bonuses. However, the most lucrative form of compensation, the mogul team bonus, treated basic, exclusive and VIP moguls differently. Basic moguls were not eligible to earn mogul team bonuses until they sold $500 worth of music to non-moguls, at which time they could earn $25 mogul team bonuses.[1] Qualified VIP moguls were automatically eligible to earn high highest available mogul team bonuses of $50 without any additional music sales.[2] (Ex. 8, § 6.3.2; PFF ¶¶ 19-20.)

_____

[1] If basic package purchasers sold $1,000 worth of music to non-moguls, they could earn mogul team bonuses of $50. (Ex. 8, § 6.3.2.)

[2] Exclusive package purchasers were automatically eligible to earn mogul team bonuses of $25. If they sold $500 worth of music to non-moguls, exclusive moguls could earn mogul team bonuses of $50. (Ex. 8, § 6.3.2.)

Throughout their proposed findings, Defendants glossed over the limitation that only *qualified* moguls could receive cash income.[3]  By omitting this fact, Defendants hope to persuade the Court that all moguls were treated similarly under the BurnLounge compensation program, regardless of which package they purchased.  Defendants reasoned that, if all moguls were treated the same under the compensation program, moguls who purchased exclusive or VIP packages did so to acquire items contained in those packages, making sales of BurnLounge packages *retail product sales*.[4]  As discussed, Defendants' argument is not supported under the compensation program: VIP moguls received greater rewards with fewer restrictions compared to basic or exclusive package purchasers.[5]

---

[3]  Defendants asserted that BurnLounge retailers who paid $6.95 per month were moguls and could participate in the compensation plan (DFF ¶¶ 20-21, 49); that moguls could convert Burn Rewards to cash (DFF ¶ 49); that moguls who met their two monthly album sales were qualified to earn concentric retail and product package bonuses (DFF ¶ 60); that moguls received $10, $20 and $50 in cash for the sale of basic, exclusive and VIP packages (DFF ¶ 61); that only the purchase of a $29.95 basic package was required to participate in the BurnLounge compensation program (DFF ¶ 84); and that additional money paid over $29.95 was optional and not required to participate in the compensation program (DFF ¶ 84).  Although arguably true, these statements are potentially misleading because they ignore the fact that, under the BurnLounge compensation program, all moguls were first required to become "qualified" before they could earn monetary compensation.  (Ex. 8 §§ 6.1.4-6.1.5; Ex. 10, pp. 3, 7, 9; PFF ¶ 19.)

[4]  Defendants contend that the most likely explanation that retailers paid an extra $100 or $400 to acquire exclusive or VIP packages is because of "products" contained in those packages.  (DFF ¶ 85.)  The more rational explanation is that those joining BurnLounge as a business opportunity paid the higher fees to obtain more lucrative compensation with fewer restrictions.  (*See* Ex. 422; PFF ¶¶ 43-46, 19-21.)

[5]  Again, VIP package purchasers were able to receive cash earnings and the highest available mogul team bonus without additional music sales.  Conversely, basic package purchasers faced the daunting challenge (*See* PFF ¶ 21) of selling $500

- 3

**B.   Defendants' Failed to Prove their Packages Had Consumable Value**

Defendants used two approaches to try to demonstrate that BurnLounge packages had consumable value.  First, Defendants relied upon an appraisal of the purported value of the items in BurnLounge packages.  Second, Defendants detailed production or manufacturing costs associated with the items.  (DFF ¶¶ 33-43.)  Both approaches fail to address the fact that receipt of the items was not relevant to most consumers' decisions to purchase a BurnLounge package.

The best evidence of value is based upon market demand.  Because BurnLounge only sold packages, there is no evidence of market demand for the items included in its packages.[6]  Instead, Defendants introduced a valuation of the imputed value for the items in the BurnLounge packages.  (DFF ¶ 33.)  For the reasons discussed in Plaintiff's proposed findings -- including the fact that

---

worth of music before they could qualify for cash income and become eligible for a $25 mogul team bonus.  (Ex. 8 §§ 6.1.4-6.1.5.)

[6] Defendants' assertion of value is undermined by its failure to sell its packages after the Complaint was filed, when BurnLounge ceased paying recruitment-based rewards.  (PFF ¶ 63.)  Defendants blame this failure on the instant enforcement action, alleging that it caused "confusion and stigma" and that BurnLounge was unable to raise capital to continue its operations.  (DFF ¶ 46B, FN 4.)  However, BurnLounge boldly and publically declared absolute victory in the lawsuit.  (Ex. 413: Press release stating BurnLounge "survived entirely intact" and Court allowed it to "move forward with its new model unabated and unrestricted"; Ex. 292, p. D0012870: BurnLounge notice to potential investors that "Court dismissed the FTC's claims entirely" and because of "victory, its business currently continues without interruption.")  Defendants' assertion that BurnLounge was unable to raise capital is also wrong.  BurnLounge's CFO Richard Piemonte testified that BurnLounge raised $1.2 million dollars after the lawsuit.  (14 RT 159:5-10.)

Defendants' expert failed to attribute any value to the BurnLounge *business opportunity* – this approach is not reliable or compelling. (*See* PFF ¶¶ 65, 49-66.)

In their second approach, Defendants attempted to demonstrate value by describing production or manufacturing costs for package items. However, these costs are only relevant to the extent that they reflect per unit costs. Defendants' business records show per unit costs of $1.50 for the basic package and $27.00 for the VIP package. (Ex. 242, p. 55.)

At trial, the evidence proved that, absent the business opportunity, BurnLounge packages lacked consumable value. Although the packages included some tangible items (or "products" to use the word to which Defendants cling[7]), those items were incidental to the business opportunity.[8] When moguls paid the entry fee required to participate in the BurnLounge compensation program by buying a package, they received certain "perks" with their packages, including:

---

[7] Defendants desperately capitalize on Plaintiff's expert witness's acceptance of defense counsel's use of the term "products." (DFF ¶¶ 31-32.) Indeed Dr. Vander Nat admitted that, if product was used to denote "something used for some purpose," then he accepted the use of the term "product." (10 RT 46:5-48:1) However, Vander Nat never conceded that the package items were *bona fide* retail products under *Koscot*, which is the ultimate issue for this Court to decide.

[8] In fact, the evidence showed that, when promoting BurnLounge, Defendants emphasized earnings that could be attained by recruiting new members and rarely discussed the items included in each package. Former BurnLounge moguls described frequent sales meetings and conferences that discussed building sales teams, but did not address the package items. (*See, e.g.,* 2 RT 65:15-69:16; 2 RT 147:9-18 (Sharp: items not "prominently featured.") Other moguls testified they did not know what items were included with their package purchase – other than the business opportunity. (*See* 2 RT 74:4-8(Becker.))

- 5 -

BurnLounge Magazine, BurnLounge Presents (BLP), BurnLounge University

(BLU), and the Event Pass. (PFF ¶ 15.) Defendants contend that these four items

were *bona fide* retail products sold to end users for personal consumption. (DFF ¶

110) However, the evidence proved otherwise.

Each of the four items was a part of and complemented the BurnLounge

business opportunity. BurnLounge Magazine, a glossy entertainment magazine,

promoted BurnLounge and was designed so that it could be used as a marketing

tool.[9] BLP exposed retailers to new music and the inventory available through

BurnLounge.[10] BLU provided general information about the music business, the

transition to digital media and BurnLounge's role in that transition.[11] Finally, the

---

[9] *Compare* 13 RT 139:2-22 (Jimenez: "[T]he company did an amazing job on the marketing materials, so we had not just an amazing hard copy magazine, but we had all these tools . . . to equip you to build the business."); 12 RT 12:22-23, 48:12-21, 50:1-6 (Murray: BurnLounge is "a great way . . . to disseminate information to our retailers," magazines target "music-loving, tech-savvy entrepreneur" and was designed to allow retailers to print their own labels and hand magazines out "as a promotion") *with* 2 RT 14:23-15:3 (Baccus: "[Y]ou got a magazine with it, but with that package you had to purchase packages . . . I didn't care about the magazines. I never read them anyway."); Ex. 242, p. 20.

[10] 13 RT 157:9-13 (Jimenez: BLP provided "great exposure to the different genres that were out that I didn't typically listen to on my own. So I thought it was great to round me out even from a retailer's perspective."); 13 RT 207:22-208:1 (Suber: "[I]f you call yourself a professional in the entertainment business, and that business is partially or some percentage of music, you need to know what music is out there,"); 12 RT 31:6-9 (Murray: BLP featured "bands that we felt were credible, we felt were doing something very relevant musically and that our retailers would benefit from being the first to know about it.")

[11] *Compare* 13 RT 154:5-15, 155:10-18 (Jimenez: BLU was a "great tool" to educate people about how BurnLounge participated in transition to digital media and to "help people present the business in the right light.") *with* Ex. 233 (DeBoer: Response to BLU was "what a joke" for $300); Ex. 18, p. 19 (DeBoer: BLU "frankly hasn't added tons of value."); 2 RT 14:6-18 (Baccus: "I thought it [BLU] was going to be something that would train me and teach me to do the business and

Event Pass, which gave some concert attendees certain benefits, also helped promote and market the BurnLounge brand.[12]

Purchase patterns of the BurnLounge packages give further proof that consumers placed little, if any, value on anything other than the business opportunity. Individuals interested in BurnLounge as a business opportunity, as evidenced by their decision to pay the $6.95 per month mogul fee, overwhelmingly purchased expensive packages. BurnLounge sales records confirm that 60,270 participants chose to be moguls. (Ex. 422; PFF ¶¶ 27, 44.) Over two-thirds of the moguls, 40,393, purchased VIP packages, 17,359 moguls purchased exclusive packages, and only 2,518 moguls purchased basic packages.[13] (Ex. 422; PFF ¶ 44.)

---

... it turned out to be a documentary of everything that they were doing and where the music comes from and where the computers come from . . . I wanted to ship it back and they [BurnLounge] said you couldn't."); 2 RT 74:21-23 (Becker: "I tried to watch it. I found it boring an ineffective to what BurnLounge was suppose to be and it's still sitting on the shelf").

[12] *Compare* 13 RT 162:3-13 (Jimenez: People who used the Event Pass were excited "about how BurnLounge was displayed . . . giving a little bit of the commercial showing that true alignment of branding and strategic partnering . . . and BurnLounge was just branded there [at Live Nation events] on the coasters, on the cocktail napkins . . ."); 13 RT 55:24-25 (Dadd: For BurnLounge to have its brand associated with Live Nation was a "tremendous feat.") *with* 13 RT 208:10-14 (Suber was not able to use Event Pass); 2 RT 15:14-15 (Baccus not interested in Event Pass.)

[13] In contrast, nearly 97 percent of the 57,997 non-moguls declined to buy *any* BurnLounge package. The 1,980 non-moguls who did purchase a package heavily favored the basic: 66 percent purchased basic packages and 17 percent each chose exclusive and VIP packages. BurnLounge University (BLU) and the Event Pass were included in VIP packages, but without the additional incentive of increased or simplified earnings, only 342 non-moguls purchased the VIP package. (Ex. 422; PFF ¶ 44.)

### C.   Plaintiff Need Not Show Every Mogul Joined BurnLounge Exclusively to Participate In the Business Opportunity

Defendants falsely asserted that the FTC has alleged "that every single person who signed up as a mogul did so exclusively to participate for profit" and not for other benefits offered by BurnLounge. (DFF ¶ 81.)  This is not Plaintiff's contention, nor is it Plaintiff's burden.

Plaintiff's claim is more limited.  The FTC states that, as a class, moguls who purchased BurnLounge packages were motivated by their desire to participate in the business opportunity and that buying a BurnLounge package was a prerequisite to becoming a mogul.  (PFF ¶ 43.)  The shared interest of moguls in earning income through BurnLounge is well documented, as is evidence that purchasers of BurnLounge packages did so to obtain the business opportunity.[14]

Defendants seek to require Plaintiff to prove that every mogul joined exclusively for the business opportunity.  Courts have refused to impose such an obligation.[15]  Section 13(b) of the FTC Act serves "a public purpose by authorizing

---

[14]  Defendants were selling a business opportunity.  (PFF ¶¶ 43-46.)  Defendant BurnLounge admitted that "the vast majority of BurnLounge retailers today are entrepreneurs (buying the VIP package)."  (Ex. 242, p. 13.)

[15]  "What compels the categorical condemnation of entrepreneurial chains [*i.e.* pyramid schemes] under Section 5 is . . . the inevitably deceptive representation (conveyed by their mere existence) that any individual can recoup his or her investment by means of inducing others to invest.  *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975), 1975 FTC LEXIS 24, at *169, *aff'd mem. sub nom Turner v. FTC*, 580 F.2d 701 (D.C. Cir. 1978).  "[P]roof of individual reliance

the Commission to seek redress on behalf of injured consumers.  It would be

inconsistent with that statutory purpose for the court to stifle effective prosecution

of large consumer redress actions by requiring proof of subjective reliance by each

individual consumer." *FTC v. Inter'l Diamond Corp.*, 1983-82 Trade Cas. (CCH)

¶ 65,725 at 69,709, 1983 U.S. Dist. LEXIS 11862 (N.D. Cal. Nov. 8, 1983).[16]

Instead, courts have held that a "presumption of actual reliance arises once

the Commission has proved that the defendant made materials misrepresentations,

that they were widely disseminated, and that consumers purchased the defendant's

product." *Figgie,* 994 F.2d at 605-06 [relied upon by Defendants at DFF ¶ 120].[17]

Plaintiff met this burden.  (PFF ¶¶ 73-77.)  Now the burden shifts to Defendants to

prove that consumers did not rely upon the misrepresentations.  *Inter'l Diamond,*

1983 U.S. Dist. LEXIS 11862, at *19; *Kitco,* 612 F. Supp. at 1293; *Figgie Inter'l,*

994 F.2d at 606.  Defendants cannot meet their burden.

---

by each purchasing customer is not needed."  *FTC v. Figgie Inter'l, Inc.,* 994 F.2d
595, 605 (9th Cir. 1993).

[16] *See Figgie Int'l,* 994 F.2d at 605; *FTC v. Security Rare Coin & Bullion Corp.,*
931 F.2d 1312, 1316 (8th Cir. 1991) ("It would be inconsistent with the statutory
purpose for the court to require proof of subjective reliance by each individual
consumer." *FTC v. Kitco of Nevada, Inc.,* 612 F. Supp. 1282, 1293 (D. Minn.
1988)).

[17] *See Security Rare Coin & Bullion,* 931 F.2d at 1316; *Inter'l Diamond,* 1983
U.S. Dist. LEXIS 11862, at *19; *Kitco,* 612 F. Supp. at 1293.

**D.    Defendants' Assertion that Participants Were Active Moguls for Only 40 Percent of the Company's Life Span Is Unsupportable and Irrelevant**

Defendants claim that, on average, moguls were active for only 40 percent of the time that BurnLounge operated.  (DFF ¶ 55.)  To reach this percentage, Defendants took an undisputed fact (from sales records, it can be shown that the average mogul paid mogul fees for 6.8 months (Ex. 422)) and divided the figure against the entire 17-month life span of BurnLounge.  Defendants attempt to use the resulting 40 percent statistic to argue two unsupportable claims: 1) moguls joined for reasons other than to earn cash compensation, and 2) the calculation of consumer injury must include a 40 percent adjustment.  (DFF ¶¶ 55 and 105.)

A prudent analysis shows that the 40 percent "active mogul status" claim is spurious.  Because moguls joined at differing times during the company's 17-month long period of operations, the average length of time that moguls paid fees would necessarily be less than 17 months.  From the undisputed facts that moguls paid monthly fees for 6.8 months on average and that the life span of BurnLounge was 17 months, one cannot deduce Defendants' claim that moguls had an affiliation with BurnLounge different from the number of months for which they paid mogul fees (*i.e.*, "that moguls were active for only 40 percent of the time").  Equally so, one cannot infer, as the Defendants do, that consumers participated in BurnLounge as non-mogul retailers for 60 percent of their time or that they joined

for reasons other than to earn income.  The data provides no evidence that moguls participated in BurnLounge in any manner when they were not paying mogul fees.

Defendants' second contention, that consumer injury must be adjusted by 40 percent, is even more easily discredited.  Plaintiff's calculation of consumer injury is based upon the payments moguls paid to participate in the BurnLounge compensation plan, less any income moguls earned.[18]  (PFF ¶ 68, F.N. 15.)  The fact that moguls may have mitigated their financial losses by ceasing to pay mogul fees does not entitle Defendants to an offset.  Perhaps because their claim is unsupportable, Defendants rely upon misstatements of testimony.[19]

**E.     Defendants' Other Misstatements and Irrelevant Assertions**

**1.     Defendants' Future Plans are Irrelevant**

Defendants spend inordinate time discussing BurnLounge's intentions and future plans.[20]  This action concerns Defendants' conduct prior to the filing of the Plaintiff's Complaint.  The pertinent question is whether BurnLounge's chosen means of marketing its business opportunity was a pyramid scheme.  The fact that

---

[18]  Defendants' contention that only the purchase of a $29.95 basic package was required to participate in the BurnLounge compensation program must be rejected because it does not reflect the disparate treatment that basic moguls faced to become "qualified" for cash earnings or to receive mogul team bonuses of $50.

[19]  Defendants inaccurately assert that Plaintiff's expert agreed an economist would ordinarily make such an adjustment.  (DFF ¶ 105.)  Dr. Vander Nat actually testified that an adjustment was not appropriate.  (10 RT 160:13-163:23.)

[20]  DFF ¶ 23 (BurnLounge discussed selling products *a la carte* in future); ¶ 27 (BurnLounge planned to expand its magazine); ¶44 (BurnLounge within weeks of expanding product line); ¶ 45 (BurnLounge to sell movies and media players).

Defendants may have intended to change their product offerings at some future point does not negate their liability for actual past business practices.

## 2.    Generalize Comparisons to Other MLMs Are Irrelevant

Defendants also rely upon generalized comparisons of BurnLounge to other, purportedly legal, multilevel marketing companies.[21]  These comparisons have absolutely no evidentiary value, particularly since Defendants failed to provide proof of the terms of the companies' compensation plans or how they operate. Ultimately, Defendants' argument that other companies operate similarly is akin to the speeding driver who complains that "other cars were going just as fast." Simply because other companies may use a business program or model that bears some alleged similarity and have not yet been sued by a regulatory agency is not evidence that they are operating within the bounds of the law.  Furthermore, in some instances, Defendants misstate the record to support this assertion.[22]

## 3.    Defendants Waived Defense of Reliance on Advice of Counsel

---

[21]   *See* DFF ¶ 54 (40 to 60 percent of participants at other multilevel marketing companies joined for reasons besides earning income); ¶ 66 ((BurnLounge plan similar to other businesses); ¶ 67 (purchase requirements to participate in BurnLounge lower than in other companies); ¶ 68 (differential requirements common to MLM companies); ¶ 69 (MLM companies and illegal pyramids share many characteristics); ¶ 70 (legal MLMs and illegal pyramids pay rewards).

[22]   Contrary to Defendants' assertions, Plaintiff's expert witness acknowledged that legal MLM companies and unlawful pyramids *may*, but did not necessarily, share similarities and that no singular characteristic was conclusive proof of an illegal pyramid.  (*Compare* DFF ¶ 69 *with* 10 R.T. 32:9-33:19.)

Defendants assert that they hired capable legal counsel when drafting the

BurnLounge compensation program (DFF ¶ 48), implying that they followed

counsel's advice and, therefore, the program was lawful.  However, Defendants

asserted the attorney-client privilege and stated that they were not raising a defense

that they relied upon the advice of counsel.  (*See* 13 RT 70:7-22.)  Noting that it

would be unfair to allow Defendants to disclose only the facts they desired without

waiving the attorney-client privilege, the Court refused to allow Defendants to

present evidence regarding retention of counsel.  (*See* 13 RT 74:17-75:3.)[23]  At

trial, no evidence was admitted regarding what advice Defendants received from

counsel, what information that advice was based upon, or whether that advice was

followed.  Accordingly, Defendants' proposed finding should be rejected.

### 4.    Defendants Misstated the Operability of Its Systems

Although BurnLounge claimed to offer state-of-the art technologies and an

extensive music catalogue (DFF ¶¶ 36-38, 40), evidence showed that BurnLounge

was riddled with operational problems and systems limitations.  (PFF ¶ 57; *see* ¶¶

54-56.)  Consumers were often unable to download music[24] and BurnLounge

---

[23]  A party "cannot be allowed, after disclosing as much as he pleases, to withhold the remainder.  He may elect to withhold or to disclose, but after a certain point his election must remain final."  8 Wigmore, *Evidence* § 2327, p. 636 (McNaughton rev. 1961).

[24]  2 RT 11:9-10, 30:17-18 (Baccus:  BurnLounge never worked properly); 2 RT 167:14-23 (Sharp:  BurnLounge frequently had technology issues and downloaded music doesn't work); 3 RT 12:14-22 (Bowers:  2 out of 3 customers could not download purchased music).

experienced chronic problems related to availability of its music database.[25]

Defendants seek to understate the severity of the problems.[26]

### 5.    "Get Rich Quick" Testimony Would Be Irrelevant

Finally, Defendants claim that the evidence failed to show either that any

retailer was "fooled into believing that BurnLounge was a 'get rich quick scheme'"

or that any one relied upon or was deceived by Defendants' misleading income

claims.[27]  (DFF ¶ 99.)  The former statement is irrelevant, while the latter is

erroneous under the facts presented and controlling law.

The FTC's Complaint does not allege, and therefore it is not necessary to

show, that Defendants misrepresented that consumers could "get rich quick"

---

[25] *See* Ex. 187 (Muze fee not running properly for months); Ex. 201 (extensive list of technology problems); Ex. 202 (functionality problems); Ex. 235 (music catalog "finally" up to date); Ex. 242, p. 20 (1.2 million songs licensed, only 250,000 ingested); Ex. 250 (faulty systems); 7 RT 27:20-28:12 (Arnold:  BurnLounge had problems with ingestion); 12 RT 38:25-39:5, 79:21-81:15 (Murray: acknowledging problems).

[26]   DFF ¶ 37 ("[T]here were some 'bugs' and problems with the new technology (at least in the early months of each iteration.)")

[27]   Defendants assert that "a number of witnesses" testified that they never heard Defendants' income claims.  (DFF ¶ 96.)  The two witnesses who so testified, Marie Jimenez and Kevin Suber, both earned profits through BurnLounge and are not a part of the injured class.  Moreover, the FTC need not show that every consumer was injured.  The existence of some satisfied customers does not constitute a defense under the FTC Act.  *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 572 (7th Cir. 1989).  It should also be noted that Jimenez's testimony is unreliable.  She is the cousin of Defendant Arnold's wife and was a top trainer and presenter for BurnLounge.  (13 RT 125:5-7; Ex. 2, pp. 72-81.)  Although she claimed that BurnLounge was not  a "big money, money, money opportunity" (13 RT 140:8-15), she also promoted BurnLounge by saying it was "more than a million dollar opportunity."  (Ex. 2, p. 75:14-16; 13 RT 176:11-16).

through the illegal pyramid scheme.[28]  Furthermore, Plaintiff must only show that there were misrepresentations made by the Defendants that were widely disseminated and that consumers purchased the Defendants' product.  *Figgie Int'l*, 994 F.2d 595, 605-06 (*cited by Defendants at* DFF ¶ 120).[29]

## III.  The Evidence Proved that Plaintiff is Entitled to Prevail on Its Claims

### A.  Defendants Operated an Unlawful Pyramid Scheme

The BurnLounge compensation program was based primarily upon recruitment, not retail sales, and resulted in 93.84 percent of participants losing money.  (PFF ¶ 67; Ex. 421.)  Defendants' promotion of the scheme, commonly referred to as a pyramid, was a deceptive act or practice prohibited by the FTC Act.

### 1.  Plaintiff Applied Proper Legal Standard for Pyramids

Plaintiff applied the test set forth in *Koscot Interplanetary*, 86 F.T.C. at 1180-81, as defined by *Webster v. Omnitrition Inter'l, Inc.*, 79 F.3d 776, 783 (9th

---

[28]  In fact, consumer testimony established that moguls were prepared to work long and hard to promote the success of their BurnLounge business opportunity. (*See* 2 RT 162:25-163:4 (Sharp worked 18-hour days "9-days a week."))

[29]  Although Plaintiff need not show that consumers relied upon the misrepresentations, several consumers testified that they heard Defendants' income claims and, relying upon those claims, believed they could also earn income through BurnLounge.  *See* 2 RT 48:10-12 (Baccus: income representations on DeBoer's website led him to believe that he could make money through BurnLounge); 2 RT 69:12-16 (Becker:  representations led him to believe that he could also earn income through BurnLounge); 2 RT 130:5-12 (Sharp: enrolled in BurnLounge after hearing that BurnLounge offered an opportunity to make lots of money, was the hottest thing since MySpace, and was a Google opportunity); 3 RT 9:4-6 (Bowers: choose [VIP] plan because he was told that he could make the most money through that plan if he put time and effort in working it); 3 RT 9:7-23 (Bowers: led to believe that he could earn thousands of dollars per month through BurnLounge, selling music and getting others to sell music.)

Cir. 1996), to determine whether a pyramid exists.  Under these precedents, the appropriate inquiry for pyramid analysis is whether participants paid money to acquire the right to sell a product and the right to receive rewards for recruiting other participants that are unrelated to the sale of products to ultimate users.[30]  Plaintiff satisfied this test with evidence of the terms of the BurnLounge compensation program, recordings and promotional material that demonstrated how it was promoted, financial records that showed its actual affect to consumers, and expert witness testimony of a skilled economist, Dr. Peter Vander Nat, who explained how the evidence supported finding that BurnLounge was a pyramid.

Because Defendants are unable to challenge the terms of their compensation program, how it was marketed, or its actual affect of causing substantial consumer injury, Defendants instead try to discredit Dr. Vander Nat's analysis.  Defendants contend that Vander Nat applied an untested, unpublished "four-pronged test" when making his analysis.[31]  (DFF ¶¶ 87-89, 117.)  In fact, Dr. Vander Nat explained the definition that he relied upon for his analysis:

---

[30]  *See Koscot*, 86 F.T.C. at 1181; *Omnitrition*, 79 F.3d at 781.

[31]  The record shows that Dr. Vander Nat did not propose a new pyramid test.  Instead, he described what Defendants have since dubbed "Vander Nat's four-pronged test" in response to the question, "What facts did you examine in your analysis?"  (8 RT 44:15-45:6.)  When asked whether *other* individuals -- who lacked his economics expertise and analysis -- would reach the same results applying *Koscot* or *Omnitrition* as he did with his four factors, Vander Nat stated that he did not know, declining to offer an opinion as to what results other individuals might reach.  (11 RT 38:11-19.)

> A pyramid scheme is an organization in which the
> participants obtain their monetary rewards primarily
> through enrolling new people into the program rather
> than selling goods and services to the public.  And
> because the funding of the rewards hinges critically on
> the ongoing enrollment of new participants, a situation is
> created in which, in fact, the vast majority of participants
> will not be in a position to recoup the rewards and,
> therefore they fail to do so and they are harmed.

(8 RT 43:18-44:1.)  This definition is consistent with both *Koscot* and *Omnitrition* because it recognizes that the primary concern in pyramid analysis is whether rewards paid to participants are related to recruitment of new participants, rather than retail sales of goods and services.

In *Omnitrition*, the Ninth Circuit recognized that a pyramid analysis requires a court to look not just at a company's written program, but also at how a program actually operated—how it was promoted, how its policies and procedures applied in practice, and how its anti-pyramiding rules were enforced.  79 F.3d at 782-783. Dr. Vander Nat's examination of BurnLounge's promotional materials, statements of policies and procedures, mathematical models, and financial data and records is congruent with the comprehensive approach favored by *Omnitrition*.  Thus, Dr.

Vander Nat's "four-pronged test" did not represent a replacement of the *Koscot* standards, but comprise a thorough analysis of those standards that included both an examination of the written terms of Defendants' program and how the program actually operated, in keeping with *Omnitrition*.

## 2.   Defendants Distort the Reasoning of *Koscot*

Defendants denied that they operated a pyramid scheme and asserted that all BurnLounge compensation was related to product sales to ultimate users.  (DFF ¶ 110.)  Defendants rely upon the fact that the BurnLounge business opportunity was sold only in *packages* that included other items.  However, Defendants' argument distorts the reasoning of *Koscot* and must be rejected for at least two reasons.

First, the assertion that BurnLounge cannot be deemed a pyramid because it included tangible items with each business opportunity defies legal reasoning.  *Koscot's* requirement that recruitment rewards be tied to product sales to ultimate users cannot be met simply by giving consumers tangible items when they paid fees to participate in the business opportunity or pyramid.  Regardless of the purported value of the items, participants paid Defendants in order to participate in the business opportunity.  (*See* discussion *supra* at Section II.B.)  Under Defendants' theory, anyone clever enough to require participants to pay an entry fee that includes unwanted or unmarketable "products" could thereby avoid

liability for operating a pyramid.  A contrived relationship between "products" and recruitment rewards does not satisfy *Koscot* and cannot defeat Plaintiff's claim.

Second, Defendants predominantly sold packages to participants within the pyramid and, in *Omnitrition*, the Ninth Circuit noted that internal sales are not sales to end users.[32] 79 F.3d at 783.  Although *Omnitrition* is an inventory loading case, the facts presented in BurnLounge are nonetheless similar:  BurnLounge participants, in order to participate in the business opportunity and maximize recruitment-based rewards, were required to buy certain packages that included unwanted and unmarketable items.  In *Omnitrition*, the rationale for rejecting internal consumption as constituting a retail sale was that internal consumption was driven by the enrollment of new participants, rather than "normal supply and demand." *Id.* at 782-3.  The evidence in the case at bar shows that the sale of the unwanted and unmarketable products contained in BurnLounge packages was similarly driven by recruitment, and not supply and demand.[33]

---

[32]  "If *Koscot* is to have any teeth, such a sale (to participants for personal use) cannot satisfy the requirement that sales be to 'ultimate users' of a product." *Id.*

[33]  Approximately 93 percent of BurnLounge's revenue derived from the sale of "product packages" to new recruits. (Ex. 242, p. 52.)  Non-recruitment sales, digital downloads of music, accounted for less than 5 percent of BurnLounge's revenues. (*Id.*)

**B.    Defendants Used False Statements to Promote Their Pyramid**

An act or practice is deceptive under Section 5(a), if there is 1) a misrepresentation, practice or omission that 2) is likely to mislead consumers acting reasonably under the circumstances and 3) is material.  *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 164-65 (1994) *cited with approval in FTC v. Pantron*, 33 F.3d 1088, 1095 (9th Cir. 1994).  At trial, the evidence proved that Defendants misrepresented that BurnLounge participants were likely to earn substantial income.  (PFF ¶¶ 73-77; *see also* Pl.'s Conclusions of Law ¶¶ 16-22.) Defendant Arnold, the founder and chief executive officer of BurnLounge, made the misleading claims himself and permitted top retailers and other leaders, including Defendants Taylor and DeBoer, to make similar claims.  (*Id.*)

Defendants' claims were demonstrably false and deceptive and were likely to mislead consumers acting reasonably.  As confirmed by BurnLounge's own sales data, 93.84 percent of BurnLounge moguls did not even recoup the price they paid for their BurnLounge packages.  (PFF ¶ 67.)  Even if Defendants' income claims were literally true and some BurnLounge participants did make substantial earnings, Defendants' statements were misleading.  Courts have found it to be deceptive to cite unusual earnings realized by only a few.[34]  In fact, several

---

[34]  *Nat'l Dynamics Corp. v. FTC*, 492 F.2d 1333, 1335 (2nd Cir. 1974); *In re Five Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000); *see also FTC v. Arlington Press, Inc.*, LEXSEE 1999 U.S. Dist. LEXIS 2055, at *27 (C.D. Cal.

consumer witnesses testified at trial that they believed Defendants' income claims

or that these claims led them to believe that they could generate income through

BurnLounge. (*See* F.N. 30.)  Claims regarding the income potential of a business

opportunity are presumed to be material.[35]

## C.    Defendants' Omissions

A material omission that is likely to mislead consumers acting reasonably

under the circumstance is a deceptive act under Section 5(a).  *Pantron I. Corp*, 33

F.3d at 1095.  While Defendants touted the extraordinary incomes or achievements

of a few BurnLounge participants, they failed to disclose that the vast majority of

investors would not earn substantial income.  (PFF ¶¶ 78-81; *see also* Pl.'s

Conclusions of Law ¶¶ 23-26.)  In fact, Defendants failed to disclose that the very

structure of the BurnLounge program necessitated that at least 87.5 percent of

investors would not break even because participants' earnings were dependant

upon passing losses on to a successive generation of BurnLounge recruits.  (PFF ¶

67.)

In light of Defendants' deceptive income claims, consumers could not have

reasonably known that they were unlikely to earn substantial incomes or that most

---

Jan. 21, 1999) ("Even if . . . literally true, a representation will be found to be
deceptive and in violation of Section 5 of the FTC Act if its net impression is likely
to mislead consumers.")

[35]   "The case law is clear that representations regarding the profit potential of a
business opportunity are important to consumers, and therefore such are material
representations in violation of Section 5." *Five Star Auto*, 97 F. Supp. 2d at 529.

BurnLounge investors did not earn any profits.  Therefore, Defendants' failure to disclose that the majority of participants in its multilevel marketing program did not earn profits was deceptive and violated Section 5(a) of the FTC Act.

**D.    The FTC's Claims Are Not Defeated by Affirmative Defenses**

Defendants seemingly abandoned their affirmative defense and submitted no proposed findings of fact that argue the FTC's claims should be barred under either the theory of laches or the doctrine of unclean hands.  Moreover, these defenses are not available against the United State or its agencies.  (Pl.'s Conclusions of Law ¶¶ 31-34.)

**IV.    Relief Requested**

Defendants' position as to relief is based on an erroneous construction of *Knudson* that limits restitution to amounts traceable to Defendants.  The Commission is seeking, not restitution, but the well-recognized remedies of rescission and disgorgement. Thus, whatever relevance *Knudson* might have to law enforcement actions based on public interest (which Plaintiff asserts is none, *see* Pl.'s Opp. to Defs.' Mot. for Partial Summ. J., pp. 9-12, Dkt. # 320), it clearly has no relevance when the remedies sought are rescission and disgorgement.

This action involves an important public interest and the FTC is the statutory guardian charged with safeguarding that interest by preventing unfair and deceptive acts in or affecting commerce.  When a public interest is at stake, the

court's equitable powers assume an even broader and more flexible character than in a private controversy.[36]  The Court has recognized that equitable monetary relief, including the rescission of contracts and disgorgement, can be ordered under Section 13(b) of the FTC Act.  (Rul. on Mot. for Partial Summ. J., Dkt. #351, p. 6.)  After considering the Court's access to equitable remedies, the egregiousness of Defendants' deceptive conduct, and the substantial harm that Defendants' law violations caused to the public, Plaintiff asks that the court order the remedies of the monetary equivalent of rescission and disgorgement.

## A.   Individual Liability

The basis for imposing individual liability against Defendants Arnold,[37] DeBoer and Taylor is well established by the record (PFF ¶¶ 97-107) and under controlling authority.  (Pl's. Conclusions of Law ¶¶ 27-30.)[38]

---

[36] *Virginia R. Co. v. System Federation*, 300 U.S. 515, 552 (1937).  *See, e.g., FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir. 1982); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432 (11th Cir. 1984); *Security Rare Coin & Bullion*, 931 F.2d at 1315; *FTC v. World Travel Vacation Brokers*, 861 F.2d 1020, 1026 (7th Cir. 1988); *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 718 (5th Cir. 1982).

[37]   Defendant Arnold is jointly and severally liable for the full amount of the monetary equivalent of rescission owed by BurnLounge. *Inter'l Diamond*, 1983 Dist. LEXIS 11862 (N.D. Cal. November 8, 1983).  *See also, FTC v. World Media Brokers*, 415 F.3d 758,765-67 (7th Cir.2006) ; *FTC v. QT, Inc.*, 448 F. Supp.2d 908, 975 (N.D. Ill.2006) (ordered joint and several liability of principal for minimum of $22.5 million in profits and maximum of $87,019,840 in net sales). Equitable recovery can exceed unjust enrichment here without any requirement of tracing.  *See FTC v. H.N. Singer, Inc.*, 1982-83 Trade Cas. (CCH) 65,010 at p. 70,619 (N.D. Cal. 1982) (ordering recovery against a salesman in excess of the amount that he had received in sales commission); *FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997) (upholding the District Court's decision that an officer of a company was jointly liable for the $361,310.79 that consumers had paid to the company).

**B.    Monetary Equivalent of Rescission**

The remedy of rescission, which seeks to undo a transaction, has been recognized by the Supreme Court as an equitable remedy. *See Randall v. Loftsgaarden,* 478 U.S. 647, 658-59 (1986).   The Ninth Circuit has recognized rescission as an appropriate remedy in Section 13(b) actions. *H.N. Singer*, 668 F.2d at 1113.

Generally a plaintiff seeking rescission must return what he has received. However, where it is impossible or infeasible to return the specific property or services at issue, thus rendering actual rescission impossible, a money substitute may take the place of the specific property or service to be returned.  Under Section 13(b), courts have broad equitable power to order monetary rescission.[39]

---

[38]   To hold Defendants individually liable for injunctive relief, the FTC must show Defendants participated directly in the deceptive conduct or had authority to control it. *Publishing Clearing House*, 104 F.3d at 1170.  For monetary relief, the FTC must also show that Defendants "had actual knowledge of the material misrepresentations [or omissions], was recklessly indifferent to the truth or falsity of a misrepresentation [or omission], or had an awareness of a high probability of fraud with an intentional avoidance of the truth. *Id.* at 1171.  Plaintiff has shown that all the named Defendants participated in the deceptive conduct and had actual knowledge of the deceptive income claims or were recklessly indifferent to the misrepresentations.  Defendant Arnold was the CEO and ultimate authority at BurnLounge and had to control the conduct.  (PFF ¶¶ CITE)

[39]  *See Security Rare Coin*, 931 F.2d at 1316 (citing *Nelson v. Serwold*, 576 F.2d 1332, 1339 (9th Cir. 1978)); *Int'l Diamond Corp.*, 1983 U.S. Dist. LEXIS 11862, at *19 (N.D. Ca. 1983); *Kitco*, 612 F. Supp. 1296; *FTC v. Solomon Trading Co., Inc.*, 1994 WL 421478, at *5 (D. Ariz. June 28, 1994); 2 Dan B. Dobbs, *Law of Remedies* § 9.3(3)(1993).

A defendant may be liable for the full amount of the monetary equivalent of rescission even though it may exceed the amount of the defendants' unjust enrichment.[40]  The redress calculation for monetary rescission typically is the difference between the amount paid for the product or service and its current market value, less any additional amount earned by or refund paid to the victim.[41]  Therefore, if the Court decides that the value of the packages is relevant to determine redress, the proper measure of value is as of the date of judgment.

Monetary rescission is an appropriate remedy in the instant case. BurnLounge packages were sold to moguls as a prerequisite to participate in the business opportunity.  Since the very structure of the business opportunity doomed the vast majority of moguls to lose money (PFF ¶ 67), the BurnLounge packages had little or no value to them.  Plaintiff seeks to redress the economic harm inflicted upon moguls, who purchased their BurnLounge packages and paid mogul fees in order to participate and earn income through the compensation program.

---

[40] *Int'l Diamond*, 1983 U.S. Dist. LEXIS 11862 at *19 (citing *H.N. Singer*, 1982-83 Trade Cas. (CCH) at ¶ 65,011 (N.D. Cal. 1982)); *Security Rare Coin*, 931 F.2d at 1316 (affirming district court's monetary rescission order, even though customer losses exceeded defendant's gain.)

[41] *Security Rare Coin*, 931 F.2d at 1316 (calculation for fraudulent investments is the difference between the amount paid for the property and its current market value); *Kitco*, 612 F. Supp. at 1295 (calculation for fraudulent business opportunities is the total amount paid, minus profit earned); *Solomon Trade*, 1994 WL 421478, at *5 (calculation for fraudulent art work is difference between amount paid and amount which owners could sell artwork in wholesale market).

The proper measure of the monetary equivalent of rescission is $21.4 million. This figure represents the amounts moguls paid to participate in the business opportunity, less any bonuses or commissions received by them. (PFF ¶ 68.) This approach is consistent with appellate decisions that have confirmed that full refunds--measured by the defendant's gross receipts--are appropriate and accord with the FTC Act's consumer protection goals. *See FTC v. Freecom Communications, Inc.*, 401 F.3d 1192, 1206-07 (10th Cir. 2005); *McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000).

Defendants attempt to limit their liability for monetary rescission by asserting that BurnLounge packages had an inherent market value that exceeded their purchase price to moguls. As discussed in Section II.B. *supra*, Defendants cannot prove the market value of their products because they never sold the purported "products" independent of the business opportunity.[42] Nonetheless, even if the Court were to impute some value to the BurnLounge packages, the most appropriate barometer of value is the Defendants' per unit cost to produce or

---

[42]  Defendants attempted to sell product packages without the business opportunity after the filing of Plaintiff's Complaint, and sales of BurnLounge packages plummeted without the pyramid scheme. (PFF ¶ 63.) Further, consumer purchase patterns demonstrated that consumers were overwhelmingly interested in the business opportunity, not the other items in the packages. (*See* PFF ¶¶ 43-44.)

acquire the items, not the unsubstantiated figures that Defendants' expert assigned to them.[43]   (PFF ¶ 50.)

## C.   Disgorgement

Disgorgement is an equitable monetary remedy designed to deprive a wrongdoer of his unjust enrichment and to deter future violations of the law.  The Ninth Circuit has held that disgorgement is an appropriate remedy under Section 13(b).  *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1103 (9th Cir. 1994).  Disgorgement is a remedy distinct from restitution.  *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993) ("Despite some casual references in our case law . . . disgorgement is not . . . restitution.").[44]

---

[43]   Defendants' expert, David Nolte, made several assertions concerning deductions that he believed should be made from any redress calculation.  First, he said only the $6.95 monthly mogul fee is subject to a recessional remedy.  (PFF ¶ 69.)  However, this is inappropriate because moguls were *required* to purchase a BurnLounge package to participate in the business opportunity.  Second, he said that moguls who joined after January 2007 should be excluded because they did not have time to recoup their investment.  (PFF ¶ 70).  This reflects Nolte's failure to grasp the nature of a pyramid scheme.  Under a pyramid scheme, participants recoup their investment only at the expense of those who join after them.  Thus, in BurnLounge, at any given point at least 87.5% of moguls were destined to lose money.  (PFF ¶¶ 67, 70.)  Finally, Nolte testified that moguls who earned no commissions or bonuses should be excluded because their lack of earnings shows that they had no intention to be "entrepreneurs."  (PFF ¶ 71.)  This assertion is contrary to the weight of the evidence.  (*See supra* Section II.B; PFF ¶ 71.)

[44]   In *Great-West Life & Annuity Ins. Co. v. Knudson*, the Supreme Court recognized disgorgement as an alternative remedy to restitution.  534 U.S. 204, 215-16 (2002) (*discussing Harris Trust and Sav. Bank v. Salmon Smith Barney, Inc.*, 530 U.S. 238, 250 (2000).)

When calculating the disgorgement amount, district courts routinely order total disgorgement of the full amount lost by consumers,[45] disregarding defendants' profits and their claims for expenses.[46]  Allowing expenses would permit the perpetrator of a successful scheme to avoid disgorgement simply by expending all of his ill-gotten gains.  *SEC v. Great Lakes Equities,* 775 F. Supp. 211, 214-25 (E.D. Mich. 1991).  If there is uncertainty regarding the redress calculation under disgorgement, that risk falls on the wrongdoer whose illegal conduct created the uncertainty.  *E.g. Febre,* 128 F.3d at 535; *SEC v. First City Financial Corp.,* 890 F.2d 1215. 1230 (D.C. Cir. 1989).

Plaintiff asserts that disgorgement is the appropriate form of remedy against Defendants Taylor and DeBoer.  Both Defendants were unjustly enriched by promoting an unlawful pyramid scheme, using false or misleading income claims and failing to disclose, when soliciting consumers to join the BurnLounge business

---

[45] "Although the 'product' which defendants sold in some instances . . . may have had some value to someone, it remains undisputed that defendants, by deceptive means, sold a . . . business opportunity that was not what they represented it to be and, therefore, had little or no value to those who purchased it.  *Gross proceeds* then is a reasonable measure of the amount by which defendants were unjustly enriched."  *FTC v. Febre,* 1996 U.S. Dist. LEXIS 9487, at *24 (N.D. Ill. 1996), *aff'd* 128 F.3d 530 (7th Cir. 1997) (emphasis added).

[46] *FTC v. Febre,* 128 F.3d 530, 536 (7th Cir. 1997). *See also  SEC v. Blavin,* 760 F.2d 706, 713 (6th Cir. 1985) ("disgorgement orders are not limited to . . . profits"); *FTC v. Medicor, LLC,* 217 F. Supp. 2d 1048, 1057 (C.D. Ca. 2002) ("Section 13(b) of the FTC Act permits the Court to order disgorgement regardless of the amount of the defendant's profits."); *SEC v. Great Lakes Equities Co.,* 775 F. Supp. 211, 214 n. 21 (E.D. Mich. 1991) ("it is clear that it is within the district courts' equitable discretion to disallow expenses incurred in perpetration of the fraud"); *SEC v. Benson,* 657 F. Supp. 1122, 1134 (S.D.N.Y. 1987) (disallowing offsets for every alleged reason, including corporate salaries and charitable giving).

opportunity, that most participants were not likely to earn substantial income.  The proper amount of disgorgement is based upon the Defendants' total receipts from BurnLounge, which is $620,139.64 for Defendant Taylor and $908,296.69 for Defendant DeBoer.  (PFF ¶¶ 7-8.)

If the Court declines to order the monetary equivalent of rescission as a remedy against Defendants BurnLounge and Arnold, Plaintiff asserts that disgorgement may also be used as a remedy.  These Defendants committed systematic and pervasive deception and violated the FTC Act by promoting an unlawful pyramid, using false or misleading income claims to promote that pyramid, and failing to disclose that most participants were not likely to earn substantial income.  The compensation program they designed and implemented ensured that 87.5 percent of those who purchased BurnLounge as a business opportunity would fail.  (PFF ¶ 67.)  Under these circumstances, a proper remedy is the total amount of unjust enrichment, which was $21.4 million for Defendant BurnLounge and $1,664,566.45 for Defendant Arnold.  (PFF ¶¶ 6, 68.)

In the event that the Court were to consider ordering disgorgement in an amount less than gross receipts, it is Plaintiff's position that there should be no deduction for the bonuses and commissions paid to the small percentage of moguls who earned money through the pyramid scheme.  A pyramid scheme is a mechanism by which money is transferred from the vast majority of people at the

bottom to a small percentage at the top.  Bonuses and commissions for the sale

packages were the fuel that drove the BurnLounge pyramid.  The 6.18 percent of

moguls who earned money through BurnLounge did so by profiting at the expense

of the 93.82 percent of moguls who failed.  The payment of bonuses and

commissions enabled Defendants like DeBoer and Taylor to richly profit from the

losses of tens of thousands of consumers who never recouped their investments in

the BurnLounge business opportunity.

  Although disallowing a deduction for the payment of bonuses and

commissions will result in a disgorgement amount in excess of BurnLounge's net

profits, Defendant should not be shielded from the economic consequences

resulting from its decision to promote its business opportunity through a pyramid.

Dated:  March 6, 2009     Respectfully submitted,
             DAVID C. SHONKA
             Acting General Counsel

             /s/ Chris M. Couillou
             CHRIS M. COUILLOU

             /s/ Dama J. Brown
             DAMA J. BROWN

             DAVID C. FIX
             THOMAS J. SYTA (Local Counsel)
             Attorneys for Plaintiff
             Federal Trade Commission

## CERTIFICATE OF SERVICE

I, Chris M. Couillou, hereby certify as follows:

    1.    I am an attorney employed by and representing the Federal Trade Commission. I am not a party to this action.

    2.    On March 6, 2009, I served the foregoing document on interested parties in this matter by causing a true and correct copy to be filed electronically via the CM/ECF system and mailed, postage prepaid, by United States first class mail and by email, to the following:

> Michael Wachtell, Esq.
> Lawrence B. Steinberg, Esq.
> Buchalter Nemer, PC
> 1000 Wilshire Blvd., Suite 1500
> Los Angeles, CA 90017
> [Email: mwachtell@buchalter.com; lsteinberg@buchalter.com;
> bnewman@buchalter.com; jmizrahi@buchalter.com;
>     ecogan@buchalter.com; jziegler@buchalter.com]

> Mr. John Taylor
> 614 Lester
> Houston, Texas 77007
> [Email: johnmarcustaylor1@yahoo.com]

> Mr. Rob DeBoer
> 316 Amberwood Circle
> Irmo, SC 29063
> [Email: rob@gotogreat.com]

I hereby certify that the foregoing is true and correct. Executed on this 6th day of March, 2009 at Atlanta, Georgia.

                  /s/ Chris M. Couillou
                  Chris M. Couillou