# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| FEDERAL TRADE COMMISSION, | ) | No. CV 07-3654-GW(FMOx) |
|---|---|---|
| | ) | |
| Plaintiff, | ) | **STATEMENT OF DECISION** |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BURNLOUNGE, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

***FEDERAL TRADE COMMISSION v. BURNLOUNGE, INC. et al.***, Case No. 07-3654
STATEMENT OF DECISION

Plaintiff Federal Trade Commission ("FTC") brought this action claiming that Defendants BurnLounge, Inc. ("BurnLounge"), its Chief Executive Officer and Chairman - Juan Alexander Arnold ("Arnold"), and independent retailers John Taylor ("Taylor") and Rob DeBoer ("DeBoer") violated Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), by promoting a pyramid scheme,[1] making deceptive income claims, and failing to disclose (when soliciting consumers to participate in the BurnLounge program) that participants were not likely to earn any substantial income. The matter proceeded to a bench trial on December 9, 2008, which concluded on December 22, 2008. During the trial, the Court received live and deposition testimony of 28 witnesses, including Defendants Arnold, DeBoer, and Taylor, and three expert witnesses. Following the trial, the Court requested and received supplemental briefs. After carefully considering the testimony of the witnesses, the joint stipulations of fact by the parties, the exhibits introduced into evidence, the pre- and post-trial written submissions of the parties, and the oral arguments of counsel, the Court issues the following Statement of Decision.

## I. FINDINGS OF FACTS

### (a)     Venue and Jurisdiction

Venue in this District is proper pursuant to Section 13(b) of the FTC Act (15 U.S.C. § 53(b)) and 28 U.S.C. § 1391. All Defendants do not reside in the same judicial district, but a substantial portion of the events giving rise to the claimed violations have occurred in the Central District of California. Defendant BurnLounge promoted, recruited, sold, and operated its business in the Central District. Declaration ("Decl.") of Bruce Gale, Trial Exhibit ("Ex.") 347, ¶¶ 2-7, 9; Exs. 1-3 & 8, § 7.1.2; Decl. of Michael Liggins, Ex. 337, ¶ 8; Decl. of Michael Marino, Ex. 349, ¶ 5; Ex. 33, p. 21; Decl. of Roberto Menjivar, Ex. 351, ¶¶ 2, 7; Ex. 37, pp. 45, 53. BurnLounge also operated a customer service office in Rancho Santa Margarita, California. See Transcript of the Trial Testimony ("Tr.") of Bernard Rivera, Day 2 PM at 14:11-23;[2] Ex. 242, p. 3. In addition, Arnold (BurnLounge's CEO) resides in this District. See Final Pretrial Conference Order (Proposed) ("FPO"), Stip. 5(e) at page 3, Docket Item Number ("Doc. No.") 353-2; Arnold Tr. Day 3 PM at 136:23-24.

---

[1] "Pyramid" or "pyramid scheme" are often used in the vernacular to refer generally to a multi-level marketing organization, whether legal or illegal. For purposes of this opinion, "pyramid" will only refer to the latter.

[2] The Reporter's Transcript of trial testimony is divided into Days 1 through 9, representing the periods of December 9-12, 15-18, and 22 of 2008 respectively. Most of the transcripts for each day are designated as either "AM" or "PM" sessions. Hence, references to trial testimony herein will be made as follows: "[name of witness] Tr. Day [#] [AM or PM, where applicable] at [page number: line numbers]." For example, a citation to "Arnold Tr. Day 3 PM at 136:23-24" would refer to Arnold's testimony which was given in the afternoon session of the third day of the trial which occurred on December 11, 2008, and indicates that the cited testimony can be found in the Reporter's Transcript for that date on page 136 at lines 23 and 24.

**(b)    The Parties**

Plaintiff FTC is an independent agency of the United States created by the FTC Act. 15 U.S.C. § 41. The FTC is charged with enforcement of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair and deceptive acts and practices in and affecting commerce. FPO, Stip. 5(a)-(b).

Defendant BurnLounge is a Delaware corporation that began making sales in late 2005. FPO, Stip. 5(c)-(d). BurnLounge had net revenues as follows: $2,158,027 in 2005, $19,158,872 in 2006, and $6,830,764 in the first six months of 2007. Exs. 64, 66. More than 60,000 people paid to participate in the BurnLounge enterprise. Ex. 1051.

Defendants Arnold, Taylor, and DeBoer all promoted the BurnLounge business opportunity. DeBoer Tr. Day 3 PM at 34:17-35:25; Taylor Tr. Day 2 PM at 125:11-126:19; Arnold Tr. Day 4 AM at 61:25-62:21.

Defendant Arnold is and was the CEO and Chairman of the Board of Directors of BurnLounge. FPO, Stip. 5(c)-(d). During his tenure, he earned $593,732.01 in salary and bonuses. Richard Piemonte Tr. Day 8 at 139:15-143:17. He also received reimbursements for certain business expenses. FPO, Stip. 5(h). Arnold beneficially owned 43.7 percent of the voting stock of BurnLounge. Ex. 242, p. 47; see also Ex. 242, p. 31. BurnLounge was the brainchild of Arnold (Arnold Tr. Day 3 PM at 142:25-143:5), and he was its "boss" and "ultimate authority." Stephen Murray Tr. Day 6 PM at 41:15-19; Arnold Tr. Day 4 AM at 12:3-15.

Defendant Taylor is a resident of Houston, Texas. John Taylor Tr. Day 2 PM at 120: 17-19; FPO, Stip. 5(j). He was a BurnLounge "VIP Mogul" (which is defined in subsections (d), (c) and (h), infra). Taylor Tr. Day 2 PM at 124:9-10. He held the first position in the binary structure of BurnLounge's compensation plan and sometimes referred to himself as "Retailer 001." Id. Day 2 PM at 124:11-20; see also Ex. 330 at page 2 marked as D0016447. Taylor's income from BurnLounge totaled $620,139.64. Id. Day 2 at 152:17-21; Ex. 191. He was not an employee or an officer of the company.[3] Taylor had participated along with Arnold in various "network marketing" companies between 1995 and 2004. Id. Day 2 PM at 121:7-122:21. Taylor also assisted in raising capital funds for BurnLounge and owned stock and stock options in the company. Id. Day 2 PM at 123:18-124:8.

Defendant DeBoer is a resident of Irmo, South Carolina. DeBoer Tr. Day 3 PM at 29:7-8; FPO, Stip. 5(j). He first became involved with BurnLounge on a part-time basis in October of 2005.[4] Id. Day 3 PM at 34:17-21 and 93:8-24; FPO, Stip. 5(k). He had no prior dealings with either Arnold or Taylor. He did not leave his prior employment with a sports equipment marketing company associated with the University of South Carolina and begin working full-time as a BurnLounge independent retailer until March of 2006. Id. Day 3 PM at 29:12-15, 95:4-6. His earned income from BurnLounge totaled $908,293.69. Id. Day 3 PM at 37:4-10. He was not an employee, officer, decision maker or shareholder of the company. Id. Day 3 PM at 95:12-24. Although he did attend and give presentations at some BurnLounge events across the country, he made his own

---

[3] However, at some BurnLounge promotional presentations, Taylor was introduced to prospective retailers as "Mr. Arnold's right-hand man." Taylor Tr. Day 3 AM at 22:13-16.

[4] According to BurnLounge's records, DeBoer was the 325th person to join the program. See Ex. 330 at page marked as D0017456.

arrangements and paid his own expenses. Id. Day 3 PM at 96:3-14.

### (c)    The BurnLounge Concept

BurnLounge was allegedly envisioned as a retailer of digital content designed to integrate music downloads, social networking, and entrepreneurship through the creation of multiple, customized, online purchase points. See Ex. 1 at 20 ("What we're doing at BurnLounge [is] combining . . . the digital downloads of iTunes, the entrepreneurship of eBay, and the connectivity, the social networking of . . . MySpace."). The company licensed music from the five major record labels through an agreement with LoudEye and (later) Muze.[5]  Murray Tr. Day 6 AM at 120:18-121:2, 150:12-151:3, Day 6 PM at 93:21-94:17; Ryan Dadd Tr. Day 7 at 5:19-8:9, 12:20-13:13, 111:15-18.  This license accounted for a myriad of major and independent recording label artists' songs, which BurnLounge customers could purchase typically for $0.99 per song or $9.90 per album. (But see footnote 11, infra).  Marie Jimenez Tr. Day 7 at 158:4-7; see also Ex. 8, § 6.2.2.  Before this action was filed, BurnLounge purportedly had agreements in place to add movies, advertising, and other digital content to its offerings; but supposedly due to the present dispute, none of these items were ever actually in place to be sold at retail.  Murray Tr. Day 6 PM at 7:12-8:10, 50:14-52:3; Dadd Tr. Day 7 at 83:16-84:20.

Defendants marketed BurnLounge as a "Multi-Level Marketing" ("MLM") business opportunity from September 2005 through June 2007, when this action was filed.  Ex. 330.  They recruited participants to the program by selling "turn-key" (i.e. ready to begin operating) websites which allowed users to customize their own online music store by choosing the layout, appearance, and featured music.  See section 1.2 of BurnLounge, Inc.: Statement of Policies and Procedures ("BurnLounge Policies") which was admitted at trial as Exhibit 8; Bernie Rivera Tr. Day 2 PM at 58:23-59:18; Taylor Tr. Day 2 PM at 153:14-154:2.  Purchasing a website was one of the prerequisites to become a BurnLounge Retailer (i.e. one who could earn the equivalent of non-cash credits towards the purchase of BurnLounge's products and services) or a "Mogul" (i.e. one who had the right to possibly earn monetary commissions from BurnLounge).  Ex. 8 § 2.2-2.2.1.  During the time BurnLounge was in operation, 60,269 people joined the enterprise as "Moguls."  Ex. 331.

### (d)    The BurnLounge System

BurnLounge created a network of web pages ("BurnPages")[6] for the sale of digital music downloads and other products.  See Ex. 8 § 1.2.  To sell its music, BurnLounge made exclusive use of independent BurnLounge "Retailers" who managed their own BurnPages, selected music to feature and otherwise customized the appearance of their sites.  Rivera Tr. Day 2 PM at 58:23-59:18; Taylor Tr. Day 2 PM at 153:14-154:2; see

---

[5] LoudEye was a company that facilitated the licensing of music for BurnLounge and "ingested" (i.e., made music available to) BurnLounge's catalog, supposedly as it became released.  See Stephen Murray Tr. Day 6 PM at 34:1-18, 93:21-94:11, 149:5-151:3.  LoudEye was later sold to Muze, which performed essentially the same function. Id. Day 6 PM at 33:15-25.

[6] The actual term used in Defendants' materials for these retail sites was "BurnLounges."  However, to avoid confusion with "BurnLounge" - the corporation, this Statement of Decision will take the liberty of referencing the sites as "BurnPages."

also Ex. 8 § 1.2. Customers wishing to purchase music from BurnLounge could not purchase it from the company directly, but had to visit the BurnPage of an independent Retailer/Mogul. Ex. 8 § 1.2

Retailers paid a fee of $29.95 per year to operate their BurnPages.[7] Ex. 8 § 2.5; see also DeBoer Tr. Day 3 PM at 84:19-24. In addition to music, Retailers could sell "product packages," which gave purchasers the ability to become Retailers themselves and create their own BurnPages. Ex. 8 §§ 2.1, 2.3. Product packages could not be purchased directly from the company but only through the BurnPages of a sponsoring independent Retailer/Mogul. Id. at § 2.3.

There were three product packages available to customers: "Basic" ($29.95), "Exclusive" ($129.95 plus $8.00 per month), and "VIP" ($429.95 plus $8.00 per month). FPO, Stip. 5(t)-(v). The Basic Package consisted of: 1) a turn-key BurnPage, 2) editing and customization software, 3) access to the BurnLounge resource center, 4) a sample copy of "BurnLounge Magazine," and 5) an annual subscription to "FrontBurner Magazine," which was an online website. FPO Stip. 5(t); Murray Tr. Day 6 PM at 21:4-15. The Exclusive Package added: 1) a year-long subscription to "BurnLounge Presents" which was a monthly bundle of 10 songs selected by BurnLounge and available for download by the Retailer, 2) a monthly DVD featuring mostly independent artists, again selected by BurnLounge's A&R Department, and 3) an annual subscription to "BurnLounge Magazine." FPO Stip 5(u). The VIP Package added: 1) the "Event Pass" which provided for, among other things, front-of-the-line admission and access to VIP lounges at certain concert events, mostly at venues operated by Live Nation such as the "House of Blues" music halls and various amphitheaters (Caroline Burruss Tr. Day 6 PM at 113:11-17, 117:22-118:18), and 2) "BurnLounge University," a boxed set of six educational DVDs documenting the history of the music industry. FPO, Stip. 5(v).

Anyone who operated a BurnPage was designated as a "Retailer" at no additional charge and could sell products through his/her e-commerce website in return for "Burn-Rewards" but could not (without more) participate in the BurnLounge Compensation Plan for cash payments. FPO, Stip. 5(w). To be eligible to participate in the cash portion of the Compensation Plan, the Retailer (in addition to purchasing a Product Package) had to pay a monthly fee of $6.95 whereupon he/she was designated as a "Mogul." Id., Stip. 5(w) and (x).

BurnLounge, in April of 2007 (approximately 6 weeks before the filing of this action), began to offer free BurnPages, which were less sophisticated than those originally offered through the Basic Package, but which did include the ability to sell downloads and earn BurnRewards. Murray Tr. Day 6 AM at 127:23-128:25, Tr. Day 6 PM at 5:9-8:1.

In return for sales of music and product packages, Retailers earned BurnRewards, points which were redeemable to pay for BurnLounge fees, downloadable music, and other merchandise, but which were not equivalent to cash. FPO Stip. 5(w); Ex. 8 §§ 6.1, 6.8. BurnLounge Retailers had the option at any time of choosing to pay the fee to become a "Mogul," which allowed him/her to convert his/her BurnRewards into cash on

---

[7] There were times when the recurring yearly fees charged to Retailers were not billed as originally planned. For example at one point, BurnLounge temporarily waived the fees in light of technical difficulties the company was experiencing in regards to the downloading of music. Murray Tr. Day 6 PM at 80:4-81:1.

a $1 per point basis, after meeting certain minimum qualifications.[8]  FPO Stip 5(w), (x);
Ex. 8 §§ 6.1.4-6.1.5.  The vast majority of Retailers (approximately 97%) chose to
become Moguls for at least part of the time they participated in the BurnLounge
enterprise.  Ex. 331.

        **(e)**       **Defendants' Expert's Valuation of the Product Packages**

       The Defendants' expert, David Nolte ("Nolte"), testified regarding the value of
each of the products bundled with the product packages.  In estimating these values,
Nolte employed a "market approach" commonly used in real estate appraisals in which
value is determined by comparable products in the marketplace.  Nolte Tr. Day 8 at
179:24-180:7, 180:20-181:13.  The FTC makes no attempt to place a value on the
bundled products, although it is critical of the methods employed by Nolte.[9]  The Court
shares many of the FTC's criticisms as delineated below.

                ***(i)* The Basic Package**

       As noted above, the Basic Package included the BurnPage, editing and customiza-
tion software, a resource center, an issue of the BurnLounge Magazine, and an annual
subscription to the FrontBurner Magazine website.  In assessing the value of the Burn-
Page, Nolte compared the costs of purportedly similar operations available from two
other websites (i.e., PayPal and Amazon) which offer online retail store opportunities.
Nolte Tr. Day 8 at 182:12-24.  According to his report, PayPal charges $360 per year to
operate an online store, and Amazon charges around $480 per year.  Nolte Tr. Day 8 at
183:20-184:1.  In his assessment, Nolte ignored the vast differences between those
business operations - such as the facts that BurnLounge provided the content for the
BurnPages;[10] that content was extremely limited (i.e., for most of the relevant time
herein, it was music downloads which were available through a plethora of competing,
already established legitimate vendors such as iTunes and Amazon.com, as well as a
large number of illegal "free" music download cites);[11] Amazon and PayPal are
established commercial enterprises with histories of reliable performance and well-
executed economic models as opposed to BurnLounge's untested technology and its
byzantine business scheme;[12] etc.  See e.g. Nolte Tr. Day 8 at 182:12-183:6.  Nolte

---

[8] A BurnLounge Retailer had to be "at least 13 years of age."  Ex. 8, § 2.1.  BurnLounge Moguls had to be
"at least 18 years of age" and "have a valid Social Security or Federal Tax ID number . . . ."  Id. at § 2.2.

[9] As noted by the FTC's expert witness, it is virtually impossible to place a reasonable value on products
bundled into the BurnLounge Packages where they are not available separately to consumers and, hence,
there is no basis to calculate or estimate any independent demand (i.e. market) or inherent worth for those
items.  Peter Vander Nat Tr. Day 5 PM at 30:2-31:8.

[10] Nolte opined that it was an "advantage" that BurnLounge provided content for its stores.  Nolte Tr. Day 8
at 182:16-21.  There was an dearth of convincing evidence to support that opinion.

[11] There was also evidence that the scope of available music downloads on the BurnLounge system was
limited.  For example, there was testimony that BurnLounge did not have immediately accessible most of
the "top 10" or "top 40" selling weekly songs and albums.  See e.g. Marshall Becker Tr. Day 2 PM at 72:3-
10 and 77:3-21; Steven Bowers Tr. Day 2 AM at 10:25-11:10.

[12] There was testimony that BurnLounge's operations had periodic system failures and glitches.

concluded that the BurnPage and its related software were worth approximately $400. Nolte Tr. Day 8 at 184:2-10. This Court finds that opinion not credible and unsupported by the evidence.

BurnLounge Magazine was a music-related publication which was issued (at different times) on a quarterly or monthly basis. Nolte Tr. Day 8 at 186:16-19; Ex. 1063. The magazine was printed in full-color on heavy stock. Id. Day 8 at 186:23-24. After citing to "Future Music," "Cinefex," "Billboard," "Mix," "Vibe," and "Down Beat" as comparable periodicals, Nolte concluded that BurnLounge Magazine had a value of $5 per issue. Id. Day 8 at 187:4-188:23. Again, this Court finds the comparisons to be inapt and without convincing supportive evidence. The publications referenced have a record of sales over many years and their continued existence in the market demonstrates some value. BurnLounge Magazine had no such record nor any indication that anyone would pay money for an issue if it were not already tied to the BurnLounge scheme. Similarly, there was insufficient evidence that the costs of producing an issue of BurnLounge Magazine was similar to those of the cited periodicals. Finally, the customer only received one sample copy with the Basic Package.

### *(ii)* The Exclusive Package

The Exclusive Package contained everything in the Basic Package plus a full year subscription to both BurnLounge Magazine and BurnLounge Presents. The lack of demonstrable value of the BurnLounge Magazine has already been discussed above.

BurnLounge Presents was a subscription to receive 10 music downloads and a music DVD every month. Nolte Tr. Day 8 at 190:1-19; 193:12-16. To estimate a value for the music download portion, Nolte compared three music/movie clubs in which the items sold were preselected by the seller: "Echo Disk," "Independent Disk," and "Film Movement" (an independent film gift-of-the-month club). Nolte Tr. Day 8 at 190:23-191:19. These subscriptions ranged from $160 per year to $190 per year, but Nolte paid more attention to the discount that occurred as a result of having the seller make the product selection. Nolte Tr. Day 8 at 191:20-191:23. Nolte noted that the greatest discount offered by the comparable subscriptions was six percent, which he applied to the price of a song ($0.99) to arrive at a value of approximately $110 for the year's worth of music downloads (120 songs). Nolte Tr. Day 8 at 192:24-193:11.

For the DVD portion of BurnLounge Presents, Nolte identified various music DVDs available for between $12 and $20. David Nolte Tr. Day 8 at 193:12-194:11. He estimated that a BurnLounge DVD "can't possibly be lower than [$10]." Nolte Tr. Day 8 at 194:12-18. Nolte concluded from the above that the yearlong subscription to BurnLounge Presents was worth at least $230 per year. Nolte Tr. Day 8 at 194:19-22.

Nolte's analysis of the values for the downloads and DVD portion of BurnLounge Presents is defective. Providing customers with downloads and DVDs of music (which they have not indicated any desire to receive) is hardly worth the $340 per year that Nolte invents. At best, BurnLounge Presents is merely a means by which the customers can be exposed to music/recording artists with which they might not be familiar. However, this Court notes that persons with access to the internet (which obviously BurnLounge Retailers would have) can listen to music/recording artists for free through such venues as Pandora, YouTube and preview samplings on websites such as Amazon.com. While, ultimately, this Court would not find that BurnLounge Presents had absolutely no value,

6

it would conclude that Nolte's valuation of $340 is grossly excessive and without adequate credible evidence.

### *(iii)* The VIP Package

The VIP Package contained everything in the Basic and Exclusive Packages plus the BurnLounge University DVD set and the LiveNation Event Pass.

BurnLounge University contained six educational DVDs documenting the history of the music industry. Nolte Tr. Day 8 at 195:5-20; FPO Stip. 5(v). Nolte compared BurnLounge University to other educational products (using the term loosely) more or less related to the music industry. Nolte Tr. Day 8 at 195:24-196:7. The products ranged from a two-and-a-half hour seminar that cost $75 to a music industry conference held in Atlanta for $250. See Nolte Tr. Day 8 at 196:15-198:3. Ultimately, Nolte concluded that BurnLounge University is worth around $150. Nolte Tr. Day 8 at 198:4-7. Burn-Lounge's policies and procedures offered a refund of $125 for the DVDs if returned unopened within 12 months of purchase. Nolte Tr. Day 8 at 198:8-14; Ex. 8 § 7.1.2. Evidence was presented that used copies of BurnLounge University were available online at Amazon.com for as little as $9.87. See Ex. 438.

The Event Pass allowed BurnLounge Retailers early entry into various clubs and amphitheaters as well as access to the VIP Lounge at many events. Caroline Burruss Tr. Day 6 PM at 118:1-18, 119:16-120:3; Nolte Tr. Day 9 AM at 8:13-23. Early admission saved concert-goers time that otherwise would have been spent in line hoping for a good seat, but obviously was only useful where the event did not have assigned seating. Caroline Burruss Tr. day 6 PM at 120:15-121:2, 122:10-19. VIP Lounge access was normally limited to season-ticket or box-seat holders who would pay between $1,250 per seat for a season ticket and $5,000 per seat per season for a box seat. Caroline Burruss Tr. day 6 PM at 120:4-14, 123:15-17. Nolte started his valuation of the Event Pass by noting that Live Nation charged between $45 and $65 for its "passes" at amphitheaters.[13] Nolte Tr. Day 9 at 8:24-9:10. He then looked at the difference between VIP lounge access and non-access for the same types of seats and concluded that it was between $90 and $175 per show. Nolte Tr. Day 9 AM at 9:11-22. Nolte concluded that the pass would have a value of around $200, noting that its value to an individual would really depend on the number of shows he/she attended per year. Nolte Tr. Day 9 AM at 9:23-10:12. Defendants presented no evidence as to how many of the VIP Package purchasers lived in an area which even had a nearby or otherwise accessible club or amphitheater where the Event Pass could be utilized.

### (f)     The Value of the Product Packages

Defendants argue that they have provided "overwhelming" evidence that the products bundled into the product packages were worth more than what BurnLounge charged for them. See Amended Final Post-Trial Brief of Defendants BurnLounge, Inc. and Juan Alexander Arnold at 10, Doc. No. 407. But the evidence was neither over-whelming nor even remotely persuasive.

Nolte's valuation of BurnLounge's products employed a "market approach," that

---

[13] It appears Nolte may be referring to ticket prices, which are irrelevant as Event Pass holders still had to purchase tickets. See Caroline Burruss Tr. Day 6 PM at 124:5-12. Live Nation did not sell Event Passes aside from those available through BurnLounge. Id. Tr. Day 6 PM at 122:20-123:14.

compared "similar" products in the marketplace such as educational DVDs and music magazines. The problem is that these products had already established themselves and survived in the marketplace. They had a history that reveals that their retail prices were near their actual value - if they were not, the products would not have survived the competition on the shelves.

Defendants note that in <u>Arab Monetary Fund v. JHH Canadian Capital Corp.</u>, 356 B.R. 728, 745 (D. Ariz. 2007), a "valuation expert" opined on the value of a piece of real estate based on a review of information on the market and comparable sales. But real estate and consumable entertainment products are not comparable in this sense. Real estate within a given area is of limited supply, is typically somewhat homogenous, and has objectively comparable features such as design, type of construction, number of rooms, square footage, <u>etc.</u> Consumer goods - especially music, DVDs, and magazines - are more prone to the vagaries of individual tastes and fickle consumer trends. Billboard and Vibe magazines have established their value in the marketplace and built a loyal following among consumers who choose those magazines over dozens of competing (and arguably less valuable) periodicals. BurnLounge Magazine, on the other hand, was a little-known, scarcely circulated periodical without even a stable production schedule. <u>See</u> Nolte Tr. Day 8 at 186:11-19.[14] Similarly, there was no evidence that the persons at BurnLounge who selected music for BurnLounge Presents had any "track record" of picking songs that would have any value or use to BurnLounge participants.

Nolte also compared BurnLounge University to a ten-DVD documentary on jazz music by renowned director, Ken Burns, which sold for about $100. Nolte Tr. Day 8 at 197:8-17, Day 9 PM at 22:15-23:9. That comparison makes no sense. BurnLounge University contained only six DVDs, was never made available through the same channels as Burns's film, and was not produced or directed by anyone of any note. In addition, Nolte's focus on the fact that the Burns's DVD set was a "secondary exploit-tation" as a reason to assume a greater value for BurnLounge University, which was a "primary exploitation," does not make sense. <u>See</u> Nolte Tr. Day 8 at 197:11-13. The Burns's documentary's primary exploitation was on public television and initially free to most consumers; and thereafter made available for purchase to the public after that exposure which helped to create a demand for the work.

Before the FTC filed suit, BurnLounge's products had not been tested in the marketplace absent their being tied into the Retailer/Mogul business opportunity. But once the multi-level business opportunity was removed, sales of the packages plummeted, indicating that the products were worth less than the expert's list of "comparable" products. <u>See</u> Exs. 65, 67, 68 (showing revenues dropped from $476,516 in June 2007 to $15,270 in July to $10,880 in August). It is also likely that this sudden drop in package sales is explained as well by the sudden drop in the number of

---

[14] In addition, Nolte considered the costs of production and the fact that BurnLounge Magazine contained very little advertising. David Nolte Tr. Day 8 at 189:7-13. But cost is irrelevant to consumer value absent any evidence of concomitant consumer demand. The lack of advertising, while it may add marginal value for some readers, speaks more to cost. <u>See</u> Defendants' Final Post-Trial Brief at 11 n. 18 ("BurnLounge Magazine contained no such advertisements [as other magazines do] and so could not rely upon advertising revenues so as to provide a discounted subscription rate."). The lack of advertising demonstrates that BurnLounge would be forced to charge a higher price for a subscription to its magazine, but not whether enough people would be willing to actually pay that price. Only the latter is an indication of value.

salespeople actively selling packages and/or by the publicity surrounding the filing of this lawsuit.

Value, of course, is subjective. One man's trash is another man's treasure. Accordingly, value is not actually a fixed quantity, but slides along a demand curve. The fact that the products contained in a VIP package might be worth at least $400 to one person is not dispositive of whether they are worth anything near that much to 50,000 other people. Nor is it initially necessary for the Court to decide whether BurnLounge charged more than its products were worth (although, in the end, the Court finds that it did for the vast majority of Exclusive and VIP package purchasers). The initial question is whether the products had so little value as to be a <u>complete</u> sham, and the Court finds that they did not.[15]

The bundled products had at least some minor value in and of themselves, and a consumer who had primarily in mind that value when he/she purchased them could not have been harmed by the scheme. The Court therefore finds the fact that the products had some value is relevant to the calculation of consumer harm, but only insofar as those products were purchased for their value as ultimate user products, and not for the conjoined business opportunity.[16] To individuals who considered the bundled products as merely incidental to the business opportunity, the Court finds the products were of no relevant value. <u>See</u> Section II(d), <u>infra</u>.

**(g)     BurnLounge's Compensation Plan/Burn Rewards**

An accurate delineation of BurnLounge's "Compensation Plan" for those persons who were enticed into its sales program (<u>i.e.</u> who became BurnLounge Retailers and/or Moguls) is difficult given the degree of complexity in its composition and the failure of its creators to value intelligibility, consistency, and useful definitions.[17] Indeed, it would appear that BurnLounge was attempting to create a labyrinth of obfuscation rather than a readily understood compensation system.[18]

---

[15] Paradoxically, the FTC claims that the value of the products is irrelevant because they were all "incidental" to the business opportunity, Plaintiff's Response to Defendant's Proposed Finding of Facts ("PR") at 5, and "part of" the business opportunity, PR at 6.

[16] Were the Court to take on the task of assigning a specific dollar value to the bundled products, it would find them to be worth far less than the amounts BurnLounge charged for them. However, some individuals purchased product packages without participating in the business opportunity. The Court is essentially giving the benefit of the doubt to BurnLounge that the products had at least as much value as the amount being charged *for those people* as evidenced by their purchasing behavior.

[17] For example, section 6.1 of <u>BurnLounge Policies</u> states that "BurnRewards are maintained in an account for each Customer . . . ." Ex. 8 at page 25. However, section 12 defines "end customer" (which is "also referred to as 'customer'" in the <u>Policies</u>) as "a person who is not a BurnLounge Retailer [and] who purchases BurnLounge products and services for personal use and not for resale." <u>Id.</u> at 45; <u>see</u> <u>also</u> Ex. 423. Given that a "customer" is not a BurnLounge Retailer, a customer could not earn or utilize Burn-Rewards and, hence, there would be no readily discernable purpose in maintaining a BurnRewards account for that person.

[18] There was testimony at trial that legal counsel had been involved in the drafting of the BurnLounge compensation program. <u>See e.g.</u> Taylor Tr. Day 3 AM at 21:5-14. However, during the course of the litigation, Defendants asserted the attorney-client privilege and indicated that they were not raising a

Everything earned by BurnLounge's Retailers and Moguls through their sales and recruitment efforts was paid in "BurnRewards," which was described as being the "currency" of BurnLounge. Ex. 8 § 6.8. BurnRewards were maintained in an account for each Retailer and Mogul. Id. Retailers could not redeem their BurnRewards for cash, but could exchange them for BurnLounge products and services, where one BurnReward Point was equivalent to one dollar. Id. "Qualified" Moguls could redeem their Burn-Reward Points for cash. Id.

BurnRewards could be earned through sales of music and product packages, or users could fund their BurnRewards account with their credit cards. Ex. 8 §§ 6.8-6.8.1. There were two types of BurnRewards Points: "Product Points" and "Cash Points." Id. § 6.8-6.8.2. Retailers earned Product Points off of sales made through their own Burn-Pages while Moguls earned Cash Points for the same. Id. § 6.8.2. Unlike Product Points, which lapse after 1 year, Cash Points never expired and were readily redeemable for their equivalent dollar value (1 point = $1). Id. §§ 6.8.2, 6.8.5. Points purchased by credit card were always Cash Points. Id. § 6.8.1. There were processing fees of three dollars for each check issued and one dollar for each direct deposit. Id. § 6.8.3.

### (h) The Mogul Program

Any Basic, Exclusive, or VIP Retailer could become a Mogul for a fee of $6.95 per month. FPO Stip. 5(w), (x). Moguls had access to the Business Management System ("BMS" or "back office"), where a Mogul could track sales, view his/her "downline" activity, access business cards and posters, see his/her BurnRewards earned, etc. Arnold Tr. Day 4 AM at 29:8-30:2; Taylor Tr. Day 2 PM at 130:1-25; see also Ex. 149.[19]

In order to convert BurnRewards to cash, a Mogul had to become a "Qualified Mogul" by meeting the following prerequisites:

- One-Time Requirements[20]
  - Sell two BurnLounge Exclusive or VIP Packages.
  - Sell at least two albums to non-Moguls.[21]
  - The following additional requirements were imposed in

---

defense based upon advice of counsel. Thus, at trial, there was no evidence as to what legal advice the Defendants actually received (if any) and whether they followed it.

[19] BurnLounge contends that individuals may have paid the $6.95 monthly fee for reasons other than to participate in the business opportunity such as to access the "back office." See Defendant's Post Trial Brief ("PTB") at 14 & n. 23. This is supposedly evidenced by the 26,670 individuals who paid the fees but never earned a single penny in BurnRewards. PTB at 14. A more likely explanation for this phenomenon is that these individuals either changed their minds about participating at all or found it too difficult to convince others to make necessary purchases. There is also evidence that BurnLounge Moguls periodically faced technical difficulties which may have made it difficult or impossible for some Moguls to make sales. See e.g. Jerry Baccus Tr. Day 1 PM at 26:9-15; Wayne Bowers Tr. Day 2 AM at 12:14-13:11. Further, it is unclear how access to the "back office" would actually benefit a BurnLounge member who did not intend to engage in the entrepreneurship endeavors promoted by the Defendants.

[20] Exclusive and VIP Moguls who joined prior to June 10, 2006, were exempt from the one-time requirements. Ex. 8 § 6.1.4.

[21] This requirement apparently changed shortly before the FTC filed this action to also disqualify sales to Retailers. See Ex. 43 at 1171.

regards to Mogul Bonuses. BurnLounge Basic Moguls had to accumulate $500 worth of Music Sales Volume ("MSV") to receive a $25 Mogul Bonus. Unless Basic Moguls fulfilled that MSV requirement, they receive no Mogul Bonuses. BurnLounge Basic Moguls had to accumulate $1,000 worth of MSV to receive the $50 Mogul Bonus. BurnLounge Exclusive Moguls had to accumulate $500 worth of MSV to receive a $50 Mogul Bonus. Until Exclusive Moguls fulfilled that requirement, they received only the $25 Mogul Bonus. VIP Moguls had no initial hurdles to their being immediately eligible to receive the higher $50 bonus.

- Monthly Requirements
  - o Sell two albums in the previous calendar month to non-Moguls.
    - ▪ If a Mogul failed to sell the two albums in the previous month, he/she could qualify for the remainder of the current month by selling ten albums, provided he/she had also met the one-time qualification requirements.
- Payment Requirements
  - o Maintain a positive BurnRewards account balance. In the event a Mogul's unpaid BurnRewards balance[22] exceeds $15, Moguls cease to be qualified for Mogul Bonuses.

Ex. 8 §§ 6.1.4-5.

### (i)     Compensation

BurnLounge rewarded Retailers and Moguls for their endeavors in three ways: Concentric Retail Compensation, Product Package Bonuses, and Mogul Team Bonuses.

#### (i) Concentric Retail Compensation

Concentric Retail rewarded Retailers/Moguls for product sales made through their own BurnPages and those of their downline recruits (if any) in the percentages delineated below. See Ex. 8 § 6.2. Product sales included music purchases, the $8 per month fee for BurnLounge Presents, and the first $29.95 of each Product Package. Ex. 8 § 6.2; Rob DeBoer Tr. Day 3 PM at 84:11-85:7.

Those individuals that a Retailer recruited into BurnLounge (i.e. sold a Product Package via his/her BurnPage) became members of his/her Direct Team, also known as Ring 1. Ex. 423 at 3.[23] Those individuals recruited by his/her Direct Team members

---

[22] Moguls had various monthly and/or yearly charges which they could pay with BurnRewards or with a credit card. In the event the chosen payment method failed, the other method was used. If both failed, BurnRewards were deducted from the Mogul's account even if that deduction overdrew the account. This made it possible for Moguls to carry a negative or unpaid BurnRewards balance. See Ex. 8 § 6.4.2.

[23] Exhibit 423 was not an official document created by BurnLounge, but it was used by the parties at trial to help explain the workings of the BurnLounge compensation structure.

became his/her Ring 2; those recruited by members of Ring 2 became Ring 3; and so on up to Ring 6. Ex. 423 at 3. After meeting "minimum" music sales requirements [delineated below], a Retailer/Mogul could earn commissions (in the form of Burn-Rewards) off of product sales made by up to six levels of his/her Rings of recruits. Ex. 8 §§ 6.1-6.1.2, 6.2.1. The compensation reward was based on a percentage of Burn-Lounge's gross margin[24] of each product sale as follows:

- Personal Sales      20%
- Direct Team (Ring 1)   12%
- Ring 2      5%
- Ring 3      5%
- Ring 4      5%
- Ring 5      5%
- Ring 6      8%

Ex. 8 § 6.2.1.

     In addition, there was a floor set on the commissions paid for music sales. The purchase of a full-priced ($9.90+) album or batch of 10 full-priced ($0.99+) songs from a Retailer's own BurnPage yielded 20% of the gross margin or $0.50, whichever was greater. Ex. 8 § 6.2.2. The purchase of a full-priced ($9.90+) album or batch of 10 full-priced ($0.99+) songs from a BurnPage owned by a member of his/her Direct Team yielded 12% of the gross margin or $0.20, whichever was greater. Id. These music sale guarantees were called the Fifty-Cent Rule and the Twenty-Cent Rule respectively. Id.

### (4) Sales Qualifications

     There were no sales requirements to receive BurnRewards for product sales on one's own BurnPage. Ex. 8 § 6.1.1. Retailers/Moguls qualified incrementally to earn Concentric Retail BurnRewards from each of their Rings. Ex. 8 § 6.1.2. The qualification to collect compensation from successive rings depended on album sales in the previous month.[25] Ex. 8 § 6.2. To earn a Concentric Retail commission from Ring 1, a Retailer/Mogul must have personally made 4 album sales from his/her BurnPage. In addition, the members of his/her team (which may include himself/herself) must have sold 8 albums (for a total of 12). To earn from Ring 2 required 8 personal sales plus 24 team sales. Ring 3 required 12 personal sales plus 48 team sales. Ring 4 required 16 personal sales plus 48 team sales. Ring 5 required 20 personal sales plus 120 team sales. Ring 6 required 24 personal sales plus 168 team sales. Ex. 8 § 6.1.2; Ex 423 at 3.

     In addition, a Retailer/Mogul must have met the one-time requirement to have sold at least one Exclusive or VIP Package (what this opinion will dub a "premium package") for each Ring of Concentric Retail for which he wishes to qualify (e.g. in order to qualify to earn commission off sales by Ring 4, the Retailer must have sold at least 4 premium packages). Ex. 8 § 6.1.2; Ex. 423 at 3.

---

[24] A review of BurnLounge's printed materials does not reveal any document which either delineates what its "gross margins" are for particular products or which explains how they are calculated. See Peter Vander Nat Tr. Day 4 PM at 110:13-114:9.

[25] Retailers/Moguls were automatically qualified vis-à-vis the prior month's album sales for all six rings for their first month.

Finally, as with the requirements for being a Qualified Mogul, a Retailer/Mogul must have maintained a positive BurnRewards account to qualify for Concentric Retail. Ex. 8 § 6.1.3. If a Retailer's balance (deficit, more accurately) exceeded $15.00, he/she ceased to receive BurnRewards on the sales of his/her downline. Ex. 8 § 6.1.3.

In some cases, Retailers/Moguls could receive Concentric Retail compensation from others beyond their Ring 6. For example, if a member failed to qualify for rewards earned by members of his/her own team, his/her BurnRewards off those sales "rolled up" to the next qualified member in his/her upline. Ex. 8 § 6.2.3.

### (ii) Product Package Bonuses

The Product Package Bonus was the most straightforward of the compensation structures used by BurnLounge. In a nutshell, qualified Retailers/Moguls received BurnRewards equivalent to $10, $20, and $50 for the sale of the Basic, Exclusive, and VIP packages respectively.[26] Ex. 8 § 6.3.1. The Retailer/Mogul must have sold at least 2 albums to non-Moguls in the previous month and have maintained a positive Burn-Rewards account balance. Ex. 8 § 6.3.1. Retailers and Moguls who were not qualified for the Product Package Bonuses received only the $5.99 Concentric Retail Commission. Id.

### (iii) Mogul Team Bonuses

The most lucrative (and most complicated) compensation vehicle is the Mogul Team Bonus. The Mogul Team Bonus uses a "binary" structure common to MLM companies to organize team members in such a way that it prevents one from free-riding off the efforts of another team member. Kevin Keranen Tr. Day 7 at 247:8-250:19.

In order to receive the Mogul Team Bonus, a Mogul must have become a "Qualified" Mogul. Ex. 8 §§ 6.1.4, 6.3.2. The requirements included: 1) "one-time" requirements of selling (a) two Exclusive or VIP packages and (b) at least two album sales to non-Moguls;[27] and 2) "monthly" requirement of selling at least two albums in the previous calendar month to non-moguls. Ex. 8 § 6.1.4. To work towards the Mogul Team Bonus, each Mogul established two Mogul Teams, his/her A-Team and his/her B-Team, into which new recruits would be placed.

As a Mogul and the members of his/her two teams sold the premium product packages (i.e. the Exclusive and VIP packages), they acquired Mogul Team Points (which were distinct from BurnReward Points) for the members of their respective teams. Sale of a VIP package yielded 400 points and an Exclusive package, 100 points.[28] Ex. 8 § 6.3.2. Mogul Team Points were awarded to the team once the newly recruited Retailer sold 2 albums. Ex. 31 at 36-37. These points accrued as long as the Mogul maintained

---

[26] The totals for the Product Package Bonus are actually a combination of the Concentric Retail commission and the Product Package Bonus. For example, the VIP Package Bonus consists of a $5.99 Concentric Retail commission and a $44.01 VIP Bonus. Ex. 8 § 6.3.1.

[27] Exclusive and VIP Moguls who joined BurnLouonge prior to its official launch on June 10, 2006, were exempted from the one-time requirements. Ex. 8 § 6.1.4.

[28] For a period of time, sales of the Basic Package yielded 30 Mogul Team Points. Murray Tr. Day 6 PM at 8:21-82:4.

his/her qualifications. Id.

### (A) Building a Mogul Team

A Mogul Team was built of multiple layers of subsequently recruited Moguls. The layers of the team expanded exponentially, with each Mogul having two team members directly below him/her, each of those members having two below him/her, and so on. See Ex. 423 at 2, 4. Each new recruit (i.e. individual to whom a premium Product Package was sold) was placed in one or the other of his/her sponsoring Mogul's teams. Ex. 8 § 6.3.2. Because each level of each team only had one member, when a second recruit was placed on, say, a Mogul's A-Team, that new recruit would fill the A slot of the next level down.[29] See Vander Nat Tr. Day 4 PM at 103:4-6.

Thus, if John, a "Qualified" Mogul, recruited two individuals, Al and Bob, they would be placed on the first level below John: Al on the A-Team, and Bob on the B-Team. If John then recruited Bill, Bill would be the second member of John's A-Team and be placed below Al (by default onto Al's A-Team). This placement puts Bill into not only John's A-Team downline, but also into Al's A-Team downline. See Ex. 423 at 2. This placement of Bill would yield Mogul Team Points not only for John, who recruited Bill, but also for Al. See Vander Nat Tr. Day 4 PM at 103:4-104:6. If John then recruited Joe, Joe would be placed on John's B-Team under Bob (i.e. on Bob's B team). This placement of Joe yields Mogul Team Points for John and Bob. See Ex. 423 at 2. It should be noted that the recruitment of Joe does not yield points for Bill or Al because Joe was placed on John's B-Team while Bill and Al are on John's A-Team.

### (B) Balancing Mogul Team Points

It is important to note that any recruitment by a Mogul's upline will only ever add points to one of that Mogul's teams. For example, John's future recruits, if they ended up on Al's and Bill's respective A-Teams, would always have been added only to Al's and Bill's respective A-Teams, never their B-Teams. More importantly, any points Bill gained by John's recruitment efforts would always be applied to his A-Team. But Mogul Team Points earned for only one team were useless. In order to convert those points into BurnRewards, (explained below) they must have been matched or "balanced" by points on his/her B-Team. But Al could not rely on the efforts of his upline (i.e. John and Al) or his A-Team downline (represented by "Sue" on Ex. 423 at 2) to recruit or develop his B-Team. He had to do it himself. Thus, the splitting of each level into two teams encouraged participation by each member of each level and prevented free-riding on the efforts of his/her team members; if Bill did not add new members to his B-Team, he could not balance (and thus could not profit off of) the points generated by John, Al, and/or Sue. See Kevin Keranen Tr. Day 7 at 247:8-250:19.

Each time a Mogul acquired 300 Mogul Team Points on each of his/her teams (300 points on the A-Team and 300 points on the B-Team for a total of 600 points), he/she would receive a Mogul Team Bonus yielding a number of BurnReward Points. Ex. 8 § 6.3.2. How many BurnReward points were awarded varied depending on the

---

[29] The Levels of a Mogul Team, which are more or less a product of the chronology of recruitment, are not to be confused with the Rings of Concentric Retail, which are a product of who recruited whom into the program. Mogul Team Layers and Concentric Retail Rings are separate and unrelated. Ex. 423 at p.3.

package the Mogul had purchased and/or the level of album sales he/she had achieved. Id. A VIP Mogul would earn a Mogul Team Bonus of $50 worth of points. An Exclusive Mogul would earn $25 worth until he/she sold $500 worth of music, after which he/she would earn $50. Id. A Basic Mogul would earn no points until he/she sold $500 in music downloads (for the $25 Mogul Team Bonus) or $1000 in music downloads (for the $50 Mogul Team Bonus). Id.

### (j)    Statistics as to BurnLounge's Operations

BurnLounge ultimately recruited approximately 62,250 people into the Burn-Lounge program. Exs. 330 (at page 1)[30] & 422. 1,980 were only Retailers while 60,270 became Moguls. Id.[31] Of the 1,980 non-Mogul Retailers, 1,297 (65.5%) purchased the Basic Package, 341 (17.2%) purchased the Exclusive Package, and 342 (17.3%) purchased the VIP package. Ex. 422. Of the 60,270 Moguls, 2,518 (4.2%) purchased the Basic Package, 17,359 (28.8%) purchased the Exclusive Package, and 40,393 (67%) purchased the VIP package. Ex. 422.

In the roughly two plus years of its operation, BurnLounge took in approximately $28,386,280 million in revenue from the endeavors of Retailers and Moguls. Ex. 330 at page 1. Music sales to Moguls accounted for $489,083, while their sales of product packages brought in $19,686,327. Id. The remaining revenue from Moguls came from the $8.00 monthly fee charged for premium BurnLounge packages (totaling $3,215,336), the $6.95 monthly Mogul fees (totaling $2,869,043), and miscellaneous merchandise purchases of $857,268. Id. Music sales to non-Mogul Retailers totaled $13,581, while their sales of product packages brought $221,175. Id. Music downloads to persons other than BurnLounge Retailers and Moguls generated $1,000,576.

BurnLounge paid out $17,458,276 in commissions. Ex. 330. The top grossing 1% of the Moguls earned 66% of the commissions/bonuses, and the top grossing 6% of the Moguls received 85% of the commissions/bonuses. Ex. 421; Vander Nat Tr. Day 5 AM at 14:13-15:12.

After the FTC filed this action, sales plummeted. See Exs. 65, 67, 68 (showing revenues dropped from $476,516 in June 2007 to $15,270 in July, and to $10,880 in August).

About 93.84% of all the Moguls (i.e. 56,557) never recouped their investment in the BurnLounge scheme. Ex. 421; Vander Nat Tr. Day 4 PM at 44:15-46:4; Vander Nat Tr. Day 5 AM at 9:11-13:1. That "business failure rate" was 92.8% for VIP Moguls, 96.3% for Exclusive Moguls, and 93.6% for Basin Moguls. Ex. 421.

The FTC's expert witness testified that, if the BurnLounge recruitment program were to operate at its "optimal" level (i.e. with each new participant purchasing the VIP package which allowed for the quickest and highest return, and with each participant in

---

[30] Exhibit 330 at page 1 indicates that there were 56,017 persons who were "never a Mogul" and who "didn't buy music package" which would mean that they were also not BurnLounge Retailers. Those persons are credited with having spent $1,000,576 for "music downloads (a la carte)," $4,856 for "merchandise purchases (a la carte)," and $112 for "payments $8.00 (BLP [BurnLounge Presents] monthly fees)." Presumably, those 56,017 persons were customers of BurnLounge Retailers and Moguls.

[31] There is a discrepancy between the data in Exhibit 330 and Exhibit 422. Exhibit 422 reports a total of 60,270 Moguls and Exhibit 330 at page 1 shows 60,269. However, as Exhibit 330 indicates, one "Mogul" entry is actually BurnLounge's A&R department and not a real person recruited as a Retailer/Mogul.

turn following the rules of the program in order to maximize his/her rewards), "even under those best of circumstances some 87.5 percent of the participants would not recoup their [investment]." Vander Nat Tr. Day 4 PM at 45:7-23. This result is due to the simple mathematics involved in BurnLounge's Mogul compensation program where continued recruitment of new members is needed to create and fund the significant returns for certain of the existing participants. See Exs. 43, 418, 419; Vander Nat Tr. Day 4 at 53:14-59: 25 and 63:4-65:4. While the BurnLounge enterprise did have the compensation scheme and revenue generated from the sale of music downloads, income from music sales could never (and in fact never did) fund any substantial portion of the rewards for the Mogul program. Vander Nat Tr. Day 4 at 70:15-72:19.

       **(k)**     **The Marketing of BurnLounge Product Packages**

       BurnLounge sold its product packages in tandem with marketing its business opportunity, which focused on recruiting new participants. Defendant Arnold testified that BurnLounge's model was to turn music fans into entrepreneurs. See Arnold Tr. Day 4 AM at 23:19-25:1. By and large, however, it was the business opportunity and not the products that drove sales of product packages. Less than 1% of the VIP packages were sold to individuals who did not participate in the Mogul Program. Ex. 422. Granted, an individual could purchase a Product Package for the bundled products and the business opportunity. But the distribution of product packages among the Moguls and non-Moguls indicates that most Moguls would not have purchased the package that they did absent the business opportunity. For instance, 67% of Moguls purchased the VIP Package, while only 17.3% of non-Mogul Retailers purchased the same. Ex. 422. 28.8% of Moguls purchased the Exclusive Package, compared with only 17.2% of non-Mogul Retailers. Id. 4.2% of Moguls purchased the Basic Package, compared with 65.5% of non-Mogul Retailers. Id.

       **(l)**     **Income Claims Made by the Defendants**

       Although BurnLounge had a policy against making income claims, Ex. 8 § 3.6.2, income claims were made by Defendants Arnold, Taylor, and DeBoer (such as the following) at meetings throughout the country and during live and prerecorded[32] telephone conference calls promoting BurnLounge or training its participants:

            *(i)* **Alex Arnold**

       [W]e're paying people 10, 25, $50,000 a month to go out there and tell their story.

Ex. 33 at 22:3-5.

       You will never get rich off your store, ever. You'll pay for gas and a couple of cab fairs [sic] per week. But if you build a community that sells a few movies and sells a few games and sells a few downloads, you will have a license to print money . . . . J.T. made $50,000 two weeks ago. He's going to make probably $700,000 this year, and he's a good old boy

---

[32] Prerecorded calls were accessed through dial-on-demand telephone numbers or the Internet. See e.g. Ex. 20 at 3: 6-11, 4:17-21, 10:8-10; Ex. 24 at 3:8-13, 6:7-9, 22: 19-21; Ex. 26 at 3:7-11, 20: 20-23; Ex. 30 at 3:7-12, 5:13-6:10; Ex. 31 at 3:7-11, 4:9-14; Ex. 32 at 3:7-13, 25:1-27:22; Ex. 41 at 3:7-11, 4:17-25; Ex. 45 at 3:7-12, 12:14-20; Ex. 48 at 3:7-12.

from Texas that can't read.

Ex. 33 at 29:23-30:6; Arnold Day 4 AM at 93:23-94:10.

> In this industry, direct sales, I created a seven-figure income by the time I was 25 years-old, and now, I plan on doing that for hundreds, thousands of people worldwide selling entertainment and digital content over the course of the next three years.

Ex. 1 at 155:13-18.

> If somebody wants to come in and generate a few hundred dollars a month, they can do that as well. If somebody wants to turn it into an incredible business and create distribution and retail, they have the ability to do that as well.

Ex. 316 at 8:9-12.

### (ii) John Taylor

> [O]ver the last six months, I've had a chance to generate well over $340,000 in income. In the last 30 days, it was over $70,000. . . . So, Scott [Elliott], you know, seven people in the company have -- you know, I've had a chance to work with that have generated well over $200,000 in the last six months. We've got residual checks in the company right now today that are a six-figure income, well over six figures.

Ex. 19 at 30:8-31:1.

> I want to make sure you guys can have whatever amount of money that you want. Some of you in this room are worth millions. There's some of you in this room that want to make money. There's some of you in here that are looking for 1,000 a month, looking for 1,000 a week, and there's some of you looking for 1,000 a day. Just depends on what you want out of this business.

Ex. 37 at 45:22-46:4.

> [H]e's a person, you know, that needs no introduction because he's out there just working tirelessly and creating – you know, incomes of you know, between $15,000 to $20,000 a week in income within this business model. I know he just received a check like that within his business just the other day and he's had weeks upon weeks upon weeks like that.

Ex. 20 at 4:17-21.

> We have 1,000 checks a week that go out to the field. Some of those checks are pretty, pretty incredible. At the same time, some of those checks are you know, $1,000 a month, $1,000 a week, $1,000 a day.

Ex. 33 at 15:8-11.

### (iii) Rob DeBoer

> Guys, we've made just under $300,000. Todd Ellis' next door neighbor has made $280,000. We've got a dozen people that have made over $100,000. A lot of people – I don't say that to impress you. We're in Columbia, you're in Atlanta, you have people of influence here.

Ex. 18 at 23:23-24:3.

> We're not here to make financial claims, but I can tell you, I walked away

from my job two months into this. My 10 best friends have made between one and $350,000 in the last six months. They've never done anything like this.

Ex. 33 at 6:8-12.

[M]y 10 best friends who have never done anything like this, didn't know anything about the industry, they've all made between 1 and $300,000 in the last seven months. In Columbia. You guys live in Chicago.

Ex. 35 at 45:25-46:3.

And for a low entry level of $450 to participate and get the support and help with proven retailers that have already maximized the business model, that have already earned tens of thousands and hundreds of thousands of dollars with, frankly, an inferior product.

Ex. 41 at 7:4-9.

Guys, I shared it with a few of my best friends. It's turned into a seven-figure annualized income. Nobody's that good, nobody's that smart in sales. This concept has to make sense.

Ex. 48 at 14:5-8.

Some of those statements were unambiguously false. Nobody made a seven-figure income from BurnLounge; there was no evidence that anyone ever earned nearly $20,000 a week in income (at least, not for any significant amount of time); and it is obvious that John Taylor came nowhere near to earning $700,000 in 2006 and he is not actually illiterate.

Income claims were pervasive among persons marketing the BurnLounge program. At times, certain BurnLounge officers did try to curb that practice. For example, Bernie Rivera, head of BurnLounge Customer Service Department, which had the responsibility of enforcing BurnLounge's policies and procedures, testified that his unit "a couple of times a week" dealt with income claims made by Retailers. Rivera Tr. Day 2 PM at 16:1-18:3, 28:18-25. Aware of the problem with income claims, Executive Vice President Kevin Keranan gave a speech before two thousand attendees at a Burn-Lounge meeting and stating: "Income claims. Guys we cannot afford it. We gotta stop doing it." Ex. 219 at D0010559; Keranan Tr. Day 7 at 311:13-21. Keranan also spoke with Defendant Arnold about income claims being made by Retailers. Arnold Tr. Day 4 AM at 62:22-63:12. Ryan Dadd, President of BurnLounge, wrote to Arnold confronting him about Arnold's making an income claim at one BurnLounge event. Ex. 252; Arnold Tr. Day 4 AM at 95:24-97:21. Keranan testified that to the best of his knowledge no one was ever terminated for making income claims. Keranan Tr. Day 7 at 304:9-13.

### (m) Material Omissions

None of the BurnLounge promotional material or the recorded sales presentations adequately disclosed that BurnLounge Moguls were not likely to make substantial income. See generally Exs. 1-10, 12-13, 18-33, 35, 37, 39, 41-43, 46, 48-49, 317, 379, 380, 293, and 316. Defendants Arnold, Taylor and DeBoer, when they made claims about their own income or that of other BurnLounge participants, never said the incomes were not typical, never said they were not representative of what the majority of Moguls would earn, and never disclosed that the majority of Moguls would not earn a profit. Ex.

18

281 at 64:17-65:7.

    BurnLounge Policies, to which Retailers were required to agree, prohibited the making of income claims. Ex. 8 § 3.6.2. While the Policies allowed the use of income examples, they were only to be utilized if it was made clear that the earnings were hypothetical and that the prospective participant was provided a current copy of the "BurnLounge's official income disclosure statement." Ex. 8 § 3.6.2. However, income claims were constantly being made by BurnLounge representatives without any sanctions from the company. Moreover, BurnLounge did not prepare an income disclosure statement until shortly before the filing of this matter, approximately 18 months after it began recruiting Moguls. Keranan Tr. Day 7 at 313:7-14; Ex. 220 at 48. BurnLounge argues that prior to that preparation, it would be difficult to make an accurate representation on the earnings of Moguls because of BurnLounge's lack of a prior operating history.[33]

## II.    DISCUSSION

###     (a)    Applicable Law

    The primary issue before the Court is whether BurnLounge operated an illegal pyramid scheme. Operating a pyramid scheme is an unfair or deceptive act affecting commerce for purposes of Section 5(a) of the FTC Act. 15 U.S.C. § 45(a); see e.g., FTC v. Five-Star Auto Club, Inc., 97 F. Supp. 2d 502, 527-33 (S.D.N.Y. 2000). Typically, pyramid schemes depend on perpetual recruitment of new participants in an exponential fashion, such that the scheme "may make money for those at the top of the chain or pyramid, but 'must end up disappointing those at the bottom who can find no recruits.'" Webster v. Omnitrition Int'l, 79 F.3d 776, 781 (9th Cir. 1996) (quoting In re Koscot Interplanetary, Inc., 86 F.T.C. 1106, 1181 (1975)) ("Koscot"). Pyramid schemes are inherently fraudulent "because they must eventually collapse." Id. at 781.

    The Ninth Circuit has adopted the FTC's test from Koscot to determine the existence of a pyramid scheme. Omnitrition Int'l, 79 F.3d at 781. Under that test, pyramid schemes:

> are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.

Koscot, 86 F.T.C. at 1181.[34] As further observed in Omnitrition Int'l, 79 F.3d at 781:

---

[33] However, if the BurnLounge venture is a pyramid scheme, one would know from its outset that the earnings of the vast majority of its participants would never cover their initial investments as a matter of simple mathematics.

[34] As described in Five-Star Auto Club, Inc., 97 F. Supp. 2d at 531:

> A pyramid scheme is a mechanism used to transfer funds from one person to another. In the most extreme form of a pyramid scheme, there is no product or service; instead, people are motivated to join by promises of a certain portion of the payments made by those who join later and are placed in one's "downline." If enough additional people join the scheme, a given member could recoup his or her initial payment and even receive additional returns. But, by the nature of the scheme, those at the bottom of the structure at any given time will have lost money, and the number of consumers at the bottom who have lost money will

> The satisfaction of the second element of the <u>Koscot</u> test is the
> *sine qua non* of a pyramid scheme: "As is apparent, the presence
> of this second element, recruitment with rewards unrelated to
> product sales, is nothing more than an elaborate chain letter in
> which individuals who pay a valuable consideration with the
> expectation of recouping it to some degree via recruitment are
> bound to be diappointed."

Under Section 13(b) of the FTC act, "after proper proof, the court may issue a
permanent injunction." 15 U.S.C. § 53(b). "The purpose of an injunction is to prevent
future violations, <u>Swift & Co. v. United States</u>, 276 U.S. 311, 326 (1928), and, of course,
it can be utilized even without a showing of past wrongs." <u>United States v. W. T. Grant
Co.</u>, 345 U.S. 629 (1953). "The necessary determination is that there exists some
cognizable danger of recurrent violation . . . ." <u>Id.</u> In addition, the court has broad,
flexible authority to grant equitable relief in the form of rescission, restitution or
disgorgement. <u>Porter v. Warner Holding Co.</u>, 328 U.S. 395, 397-98 (1946); <u>Hecht Co. v.
Bowles</u>, 321 U.S. 321, 329 (1944); <u>FTC v. Pantron I Corp.</u>, 33 F.3d 1088, 1102 (9th Cir.
1994); <u>FTC v. H. N. Singer, Inc.</u>, 668 F.2d 1107, 1113 (9th Cir. 1982).

### (b)     The Existence of a Pyramid

"Whether a multi-level marketing plan operates as an illegal pyramid scheme is
determined by how it functions in practice." <u>Whole Living, Inc. v. Tolman</u>, 344 F. Supp.
2d 739, 745 (D. Utah 2004). As observed in <u>FTC v. SkyBiz.com, Inc.</u>, 2001 U.S. Dist.
LEXIS 26175 at *28 (N.D. Okla. Aug. 31, 2001):

> A lawful multi-level marketing program is distinguishable from an
> illegal pyramid scheme in the sense that the "primary purpose" of
> the enterprise and its associated individuals is to sell or market an
> end-product with end-consumers, and not to reward associated
> individuals for the recruitment of more marketers or "associates."

At its core, BurnLouge's business consisted of two components: 1) the sale of
"downloadable music and music-related products and services through . . . online
BurnLouge software . . . by purchasing one of the three BurnLounge [product] packages"
and 2) the "BurnLounge Mogul program, which allows [BurnLounge Retailer/Moguls] to
turn their [Burn] rewards into cash." <u>See</u> Ex. 8 § 1.2. While both were promoted as
business opportunities, it is/was readily apparent that only through the latter could one
possibly achieve any significant financial return (as touted by BurnLounge's boosters)
and even then only through the recruitment of new BurnLounge Retailer/Moguls via sales
of Exclusive and VIP product packages, with those Retailer/Moguls in turn recruiting
new participants, and so on.[35]  Both as designed and in execution, the BurnLounge

---

grow exponentially as more people are recruited to join. Moreover, the required
number of new members cannot, in fact, be recruited on a perpetual basis,
causing the scheme to collapse of its own weight if it does not first falter when a
significant number of members are unable to find enough people as gullible as
themselves to recruit.

[35] These points were emphasized in BurnLounge's promotional materials and by the representations of its
champions. <u>See e.g.</u> "New VIP Retailer Playbook" Ex. 43 at pages 3-5; Becker Tr. Day 1 PM at 78:6-

enterprise resulted in a large return for a small percentage of the Moguls which was funded by the substantial losses (i.e. the failure to recoup their initial investments) of the vast majority of recruited participants. See Section I(j) supra. The Court finds that the FTC has established that a majority of the BurnLounge business (consisting of the Mogul program and related elements) was a pyramid scheme.

BurnLounge Retailers/Moguls paid at least $29.95 for the right to sell downloads in return for BurnRewards. The $29.95 charge gave the Retailer/Mogul access to the software needed to customize a BurnPage and manage its contents. While the Court may disagree with the amount charged for such software, it is clear that the software was physically necessary for a Mogul to operate his/her business, and it is not out of line for BurnLounge to have charged a nominal fee (less than $3.00 per month) for the use of that software.[36]

However, because participation in the program required the purchase of a product package, and Moguls earned cash for selling these product packages to those they sponsored, they by default received compensation for recruiting others into the program. See Matter of Amway Corp, Inc., 93 F.T.C. 618, 716 (1979) (distinguishing requisite purchase of a sales kit from a pyramid scheme's entry fee because "no profit was made [by the recruiter] in the sale of the Kit, and the purchase price may be refunded if the distributor decides to leave the business"); cf. Omnitrition Int'l, 79 F.3d at 782 ("Distributor" level of Omnitrition was not a pyramid scheme because "the participant pa[id] no money to Omnitrition . . . and ha[d] no right to receive compensation for recruiting others into the program. The distributor level, however, is only a small part of the entire program.").

BurnLounge argues that the sale of the Basic Package (i.e. the sale of an individual BurnPage and its required software) is the sale of a product to an ultimate user.[37] See Whole Living, Inc., 344 F. Supp. 2d at 745-46 ("A structure that allows commission on downline purchases by other distributors does not, by itself, render a multi-level marketing scheme an illegal pyramid."). While it is true that the BurnPage could be considered a "product" and a Retailer to be the "user" of that product, this argument ignores the nature of the use itself. That is as a tool for sales and (more importantly) for recruitment, as demonstrated by a review of the BurnLounge promotional materials, the presentations of its spokespersons, and the statistics as to the participants who bought into the enterprise. While it is true that Retailers could merely sell music downloads through their BurnPages, Retailers/Moguls generated many times more revenue from the sale of the business opportunity to new participants than the

---

79:16; Ex. 40 at 1147 (which highlighted the hundreds of dollars to be made from the "balanced" sales of VIP packages, but noted only that there would be a concomitant "small profit from any music sales").

[36] The $6.95 monthly Mogul Fee is not an important element here because the sponsoring Retailer/Mogul did not receive commission off of it. Suffice it to say that the overwhelming majority of participants paid the fee in order to be able to convert their BurnRewards and/or Mogul Team Bonuses into cash.

[37] The FTC points to language in the BurnLounge's Policies for the contention that Retailers and Moguls were not ultimate users because "end customer" was defined in that document as being a non-Retailer. See Ex. 8 § 12. Semantic differences aside, the FTC's argument is supportive but not controlling. Burn-Lounge's definition of an end customer would not be determinative as to whom the Court may consider to be the ultimate user of a product.

meager rewards of vending the music downloads available on the BurnLounge system. Ex. 330; Vander Nat Tr. Day 4 PM at 72:6-12 ("when you compare Mogul rewards to actual album sales, the ratio is roughly $17 in Mogul rewards for every one dollar of album sales."); see U.S. v. Gold Unlimited, Inc., 177 F.3d 472, 481 (6th Cir. 1999) (noting that, in determining whether a pyramid exists, evidence of a marketing program's effect deserves more weight than that of its policies). As noted in Omnitrition Int'l, 79 F.3d at 782: "The promise of lucrative rewards for recruiting others tends to induce participants to focus on the recruitment side of the business at the expense of their retail marketing efforts, making it unlikely that meaningful opportunities for retail sales will occur." Thus, the fact that some retail sales occur does not mitigate the unlawful nature of the overall arrangement. Omnitrition Int'l, 79 F.3d at 782, citing In re Ger-Ro-Mar, Inc., 84 F.T.C. 95, 148-49 (1974), rev'd on other grounds, 518 F.2d 33 (2d Cir. 1975). The danger of such "recruitment focus" is present in the BurnLounge program. Id. 79 F.3d at 782. The Court thus finds that, at least initially, BurnLounge's compensation for the first $29.95 of each Product Package was directly tied to recruitment, fails the Koscot test, and was part of the pyramid scheme.

Starting in April of 2007, when BurnLounge began to offer a limited version of the BurnPage at no charge, the business opportunity was untied from the Basic Package. In other words, because one no longer needed to purchase the Basic Package to partici-pate in the business, sales and fees as to the Basic Package after April 2007 were not linked to recruiting.[38]

BurnLounge's premium packages (i.e. the Exclusive and the VIP Packages) included all of the benefits of the Basic Package (and thus the ability to participate in BurnLounge's business opportunity). In this sense, the Exclusive and VIP Packages, beyond the first $29.95 charged, were not prerequisites for participation as a Mogul. It may seem, then, that the additional $100 and $400 charges for those packages does not fall within the first prong of Koscot because they are not "characterized by the payment . . . of money . . . for . . . the right sell a product." Koscot, 86 F.T.C. at 1181.

Indeed, BurnLounge went to great lengths at the trial to argue that sales of the premium packages were sales of products (e.g. BurnLounge Presents, BurnLounge Magazine, the LiveNation EventPass, BurnLounge University, etc.) to ultimate users and that any rewards paid in return for recruiting were exclusively tied to those sales. But clearly that was not the case. The premium packages did contain bundles of products, and the Court finds that those products did have some extremely limited value to some consumers, but those packages also contained for their purchasers the opportunity to more quickly collect higher commissions (i.e. Mogul Team Bonuses) for the sale of those same items. Specifically, the Exclusive and VIP Packages allowed participants to bypass the album-sales requirements to obtain higher Mogul Team Bonuses ($25 and $50, respectively). In other words, a Basic Mogul could earn a $50 Mogul Team Bonus only after selling $1000 worth of music, but an Exclusive Mogul could earn the same after

---

[38] This presumes that Retailers using the free BurnPage could participate in the Mogul program, which appears to be supported by the evidence. Exhibit 330 shows a number of individuals who joined after April 2007, paid the Mogul fee, but paid no money for a Product Package. Ex. 330.

selling only $500 worth.[39]  A VIP Mogul could earn the $50 bonus from the start.[40]  This adjustment in the Mogul Team Bonus (based only upon the nature of the package purchased) was not a retail product, it was part of the business opportunity - the opportunity to earn higher commissions on specific transactions than he/she otherwise would.  More importantly, it created a reason for prospective Moguls to purchase a premium package regardless of the value received from the products bundled within it.

In Omnitrition Int'l, the Ninth Circuit noted that, although participants could participate in the defendant's business opportunity at no charge, the wholesale purchase requirements for distributors to begin to earn commission on sales by their recruits made the program appear to be a pyramid scheme on its face.  79 F.3d at 782.  Defendants argue that Omnitrition Int'l is distinguishable because it involved an inventory-loading scheme while BurnLounge did not require purchases of inventory.  This is a distinction without a difference.  Inventory-loading pyramids are not illegal simply because there are wholesale purchasing requirements.  They are illegal because the purchases are incentivized by commissions that result from recruiting others to join the scheme through similar purchases.  The FTC in Amway pointed out that participants in the Koscot and Holiday Magic pyramid schemes essentially paid to receive payment for recruiting.  93 F.T.C. at 715-16 (distinguishing the Amway program from a pyramid scheme because it "is not a plan where participants purchase the right to earn profits by recruiting other participants, who themselves are interested in recruitments fees rather than the sales of products."), citing Koscot, 86 F.T.C. at 1131, 1140, 1179; In the Matter of Holiday Magic, Inc., 84 F.T.C. 748, 1032, 1035 (1974).  That primary recruitment emphasis is precisely how BurnLounge operated.  Participants paid the additional $100 or $400 for the ability to more quickly earn higher Mogul Team Bonuses for inducing others to do the same.  Such sales were not driven by market forces, but by the illusion that such an enterprise is sustainable at least long enough for the next purchaser to recoup his/her initial investment.

The Court finds BurnLounge's sales of the Exclusive and VIP Packages were directly tied to recruitment, fail the Koscot test, and were "pyramidal" in nature.

### (c)    Misleading Income Claims

A statement is misleading if the representation is likely to deceive reasonable consumers to their detriment.  See Southwest Sunsites, Inc. v. F.T.C., 785 F.2d 1431, 1435 (9th Cir. 1986).  Such misrepresentations are actionable under Section 5 even if made without an intent to deceive.  FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir. 1988); Beneficial Corp. v. FTC, 542 F.2d 611, 617 (3d Cir.1976).

This Court finds that (from the evidence presented at the trial) all of the Defendants (including BurnLounge itself through the statements of its CEO Arnold and by its authorized agents at the various company sponsored presentations) made misleading affirmative representations regarding the actual and potential income of BurnLounge

---

[39] It does not appear from the evidence proffered at trial that any Basic or Exclusive Mogul ever achieved the delineated music sales volume necessary to qualify for a higher Mogul Team Bonus.

[40] This assumes the Mogul, whatever his/her level, was a "qualified" Mogul by satisfying the one-time requirement to sell two premium packages and the monthly requirement to sell two albums.

participants, and also failed to disclose material information (such as the fact that most participants would not be able to recover their initial outlays for the Exclusive and VIP Packages).

The Defendants argue that any misleading statements as to income were mere puffery and/or not material. That is not so. Generalized or exaggerated statements upon which reasonable consumers would not rely are considered "puffery" and are non-actionable. In re All Terrain Vehicle Litigation, 771 F.Supp. 1057, 1061 (C.D. Cal., 1991). In Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service, 911 F.2d 242, 246 (9th Cir. 1990), the Ninth Circuit noted:

> In the FTC context, we have recognized puffery in advertising to be "claims [which] are either vague or highly subjective." Sterling Drug, Inc. v. Federal Trade Commission, 741 F.2d 1146, 1150 (9th Cir. 1984), cert. denied, 470 U.S. 1084 (1985). The common theme that seems to run through cases considering puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions.

Here, the misleading items were not vague or merely suggestive pronouncements, but rather specific references to actual (or purportedly actual) income amounts earned by individuals or groups of BurnLounge participants. For example, John Taylor never made $700,000 in any given year (as claimed by Arnold); there were never 1,000 checks a week going "out into the field" where some of them were for "$1,000 a day" (as touted by Taylor); and DeBoer was not making a seven-figure annualized income as he himself represented.

In addition, where a person markets what is in essence a pyramid scheme, he/she must at a minimum advise potential investors of the unlikelihood of any substantial returns. In Omnitrition Int'l, it was observed that:

> Misrepresentations, knowledge and intent follow from the inherently fraudulent nature of a pyramid scheme as a matter of law. As to justifiable reliance, . . . . the very reasons for the *per se* illegality of Endless Chain schemes is their inherent deceptiveness and the fact that the "futility" of the plan is not "apparent to the consumer participant."

79 F.3d at 788 (citations omitted). Here, the Defendants failed to disclose that material information.

### (d)     Harm to Consumers

BurnLounge criticizes the FTC for its description of the enterprise which equates selling with recruiting; but the structure of BurnLounge's Mogul compensation program tied recruiting and selling so closely together that the FTC's characterization is the only one possible. For the most part, nobody could be successfully recruited into the Mogul program unless they were sold a product package, and virtually everyone who was sold a product package was recruited into the Mogul program (i.e., 60,270 of the 62,250 individuals who purchased a BurnLounge product package joined the Mogul program at some point, which equals 96.8%). Ex. 422.

Because BurnLounge tied legitimate sales of products so closely with the

24

illegitimate pyramidal business opportunity, the motivation of consumers in purchasing the product packages is vital to the calculation of consumer harm. Neither party, however, presented any type of survey evidence of the motivation of consumers in making their purchases; the FTC arguing that consumers only sought the business opportunity, and BurnLounge arguing that consumers primarily sought the value in the product packages despite the business opportunity. Neither argument is persuasive and the Court is entitled to make its own estimates based on the best available information. See FTC v. QT, Inc., 512 F.3d 858, 864 (7th Cir. 2008). The Court will determine the harm done to consumers as follows.

Of the 60,270 Mogul participants, 3,713 made a profit (i.e., had more than a return of their initial investment). Exs. 330, 422. These Moguls were not injured by the scheme and will be factored out for purposes of calculating harm to consumers.[41] The remaining number of Moguls is 56,557.

The Basic Package was of nominal value, absent the opportunity to earn money as a Mogul. Only about 3.2% (i.e., 1,980 ÷ 62,250) of all BurnLounge participants purchased a product package without participating in the Mogul program (i.e. arguably, for value offered other than the business opportunity). Ex. 422. However, of those who purchased a package, with or without participating in the business, a certain number must have found value outside of the Mogul program. That is, it can be inferred that at least some of the Moguls would have purchased the Basic Package even if the Mogul Program had not existed. 31.7% of non-Mogul users (both customers and Retailers) who registered an account at Burn-Lounge purchased at least one album.[42] Ex. 422. 3.4% of all users who registered purchased at least a Basic Package. Ex. 422. Assuming these groups overlapped completely,[43] 10.8% of non-Moguls (i.e. 31.7% × 3.4%) who purchased at least an album also purchased a package. The Court will use this as a rough estimate of the percentage of Moguls who would have found enough value in the Basic Package to purchase it absent the Mogul program.

Additionally, from approximately mid-April through June of 2008, the business opportunity was offered free and separate from the Basic Package. See § I(d) supra. During that time, Concentric Retail commissions on Basic Packages and on the first $29.95 of premium packages were not payment for recruiting and will not be calculated as part of the harm to consumers. In April of 2007, BurnLounge sold 1,685 product packages to Moguls. Ex. 330. The Court will estimate that half of these (843) were sold after the free BurnPages became available. In May of 2007, BurnLounge sold 2,059 product packages, and in June, 421. Ex. 330. This is a total of 3,323 sales to Moguls which will be excluded from the calculation (56,557 − 3,323 = 53,234).

Using all of the above as a rough measure of the harm done to consumers, the Court finds that 89.2% of all revenues collected from Moguls for the Basic Package (and

---

[41] This is especially true since the FTC is not seeking any restitution/disgorgement from the Moguls who made a profit from the BurnLounge scheme, with the exceptions of Taylor and DeBoer.

[42] The remainder either created an account without making any purchase or perhaps purchased only a handful of individual songs.

[43] Even if it is assumed they do not overlap at all, the numbers in the final calculation do not change very much.

including the first $29.95 of each premium package) constitute consumer harm from BurnLounge's operation of its pyramid scheme. That total is $1,422,167.60 ($29.95 x 53,234 Moguls x 89.2%).

The products bundled into the premium product packages did have some tangible value, and it can be inferred that at least some Moguls purchased those packages for the value offered. Retailers paid $100 above the cost of a Basic Package for the Exclusive Package. Retailers paid $300 above the cost of an Exclusive Package for the VIP Package.

Giving the Defendants a generous benefit of the doubt on this point, the Court will use the percentage of non-Mogul Retailers who purchased either an Exclusive or VIP package (34.5%) as a proxy for determining the percentage of Moguls who purchased the Exclusive package specifically for the value of the products received rather than solely for the increased Mogul Bonus opportunity.[44] Ex. 422. By this measure, the harm done to consumers by the sale of the Exclusive Package is 65.5% of the Exclusive portion ($100) of every premium package sold. That total is $3,539,554.50 ($100 x 54,039 premium package Moguls[45] x 65.5%).

Additionally, premium Moguls paid a BurnLounge Presents fee of $8.00 per month. BurnLounge took in $2,912,040.00 in monthly BurnLounge Presents fees from unprofitable Moguls. Ex. 330. Discounting those who likely purchased their premium package for its product value, the Court finds total harm done to consumers of $1,907,386.20 ($2,912,040.00 x 65.5%).

The Court will use the percentage of non-Mogul Retailers who purchased a VIP package (17.3%) as a proxy for determining the percentage of Moguls who purchased the same specifically for the value of the products received rather than for the increased Mogul Bonus opportunity. By this measure, the harm done to consumers by the sale of the VIP package is 82.7% of the VIP portion ($300) of every VIP Package sold. That total is $9,376,691.40 ($300 x 37,794 VIP Moguls[46] x 82.7%).

Total harm to consumers therefore equals $1,422,167.60 + $3,539,554.50 + $1,907,386.20 + $9,376,691.40 = $16,245,799.70.[47]

---

[44] The non-Mogul purchases of the VIP Package are included because that package included every product in the Exclusive Package as if it were purchased separately.

[45] There were 57,572 premium BurnLounge packages sold – 40,393 VIP Packages and 17,359 Exclusive Packages. Ex. 422. This Court will treat the 3713 Moguls who made a profit as all falling within those two categories and in the same ratio (i.e. 70% in the VIP Mogul group and 30% in the Exclusive Mogul group). 57,752 premium package Moguls minus 3,713 profiting Moguls equals 54,039.

[46] Of the 3713 Moguls who made a profit, 70% would fall within the VIP category (see footnote 45, supra), which would equal 2599. Therefore, of the 40,393 individuals who purchased a VIP Package, 37,794 did not make any profit and would be considered in the harm calculation.

[47] Payment of the Mogul fee was used in determining which Moguls experienced a net loss on their business. However, the calculation of harm to Moguls (who failed to make a profit) does not factor in the Mogul fee, which served both legitimate and illegitimate purposes, or any offset for commissions paid to those same Moguls, which compensated both legitimate and illegitimate parts of the business. By coincidence, these two totals differ by very little, Ex. 330, and even if the legitimate and illegitimate purposes could be separated from each, the result would likely be a wash. For the sake of simplicity they are simply ignored in the estimation of consumer harm.

(e)    **Liability of Individual Defendants**
          *(i)    **BurnLounge and Arnold***

The FTC argues that Defendant Arnold should be held jointly and severally liable for any amount owed by BurnLounge. This Court generally agrees. As an officer, Arnold:

> . . . may be held individually liable for injunctive relief under the [Federal Trade Commission Act] for corporate practices if the FTC can prove (1) that the corporation committed misrepresentations or omissions of a kind usually relied on by a reasonably prudent person, resulting in consumer injury, and (2) that [defendant] participated directly in the acts or practices or had authority to control them. * * * * [and (3) he/she] had knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted.

FTC v. Publishing Clearing House, Inc., 104 F.3d 1168, 1170-71 (9th Cir. 1997), quoting FTC v. American Standard Credit Systems, Inc., 874 F.Supp. 1080, 1087-89 (C.D. Cal. 1994).

Defendant Arnold is liable because he indeed had the ability to control BurnLounge. He was the originator of the BurnLounge concept, was one of its primary investors and shareholders, was recognized as the "boss" and its "ultimate authority," and spearheaded the making of the compensation plan. It is undisputed that he was the controlling force behind the creation of what in essence was a pyramid scheme. Further, because a majority of the BurnLounge enterprise was an illegal pyramid operation, "misrepresentation[], knowledge and intent follow from the inherently fraudulent nature" of that scheme "as a matter of law." Omnitrition Int'l, 79 F.3d at 788.

Thus, both BurnLounge and Arnold are liable for the total amount of the harm to consumers determined above to be in the amount of $16,245,799.70.[48]

          *(ii)    **Taylor***

The Court finds that Taylor is not an innocent investor in the BurnLounge enterprise. While not formally an officer or employee of the company, Taylor was involved at the beginning in the raising capital funds for BurnLounge. He also owned stock and was provided with stock options. He had previously participated with Arnold in various network marketing companies. Very importantly, he was placed in first position at the binary structure of BurnLounge's Mogul compensation plan as "Retailer 001." Furthermore, he made material misrepresentations at BurnLounge's public functions where he was (on occasion) introduced as "Mr. Arnold's right-hand man."

Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), provides not only for the issuance of injunctive relief, but also the authority to grant any ancillary relief necessary to accomplish complete justice, including orders for restitution and

---

[48] The finding as to Arnold's liability for the $16,245,799.70 is premised on the Court's understanding that the FTC intends to utilize any recovered amounts in this case to directly reimburse individuals who lost their investments in the BurnLounge scheme. Should that premise be incorrect, the Court would alternatively order Arnold to disgorge the monies and other items of enrichment which he received from BurnLounge and which total $1,664,566.45. See Pantron I Corp., 33 F.3d at 1103 n.34.

27

disgorgement. <u>Pantron I Corp.</u>, 33 F.3d at 1102. In light of the extent of his involvement in the BurnLounge scheme, the Court finds that Taylor should be required to disgorge all monies and other items of enrichment which he obtained from BurnLounge's operations. That amount, as previously noted, is $620,139.64.

     *(iii)*   **DeBoer**

   As to Defendant DeBoer, he was not involved in any way in the creation or structure of the BurnLounge business. It is true that DeBoer did work to promote the enterprise and secure recruits, but so did a myriad of other Retailer/Moguls. Indeed, had he not been so effective a salesman, he would be one of the victims of the scheme whom the FTC seeks to protect in this litigation. However, he did speak at certain of the company's presentations where he made some misleading statements as to income. While he could be held liable as to those persons whom his statements directly mislead, the FTC has not provided any evidence which identifies either the individuals who were in fact mislead by DeBoer or the amounts of their losses.

   There is one Ninth Circuit case which is somewhat germane to DeBoer's situation. In <u>Donell v. Kowell</u>, 533 F.3d 762 (9th Cir. 2004), the defendant Kowell unwittingly joined a Ponzi scheme (where the business eventually went into receivership) and made a profit of several thousand dollars. Years later, despite being an innocent participant, he was sued by the receiver and ordered by the trial court to return a portion of the profits he acquired from the fraudulent scheme (recovery of the other portion was barred by the statute of limitations). In upholding the order, the Ninth Circuit wrote:

> [T]he general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers:
>
> > The money used for the [underlying investments] came from investors gulled by fraudulent representations. [The defendant] was one of those investors, and it may seem "only fair" that he should be entitled to the profits on trades made with his money. That would be true as between him and [the Ponzi scheme operator]. It is not true as between him and either the creditors of or the other investors in the corporations. He should not be permitted to benefit from a fraud at their expense merely because he was not himself to blame for the fraud. All he is being asked to do is to return the net profits of his investment - the difference between what he put in at the beginning and what he had at the end.
>
> <u>Scholes [v. Lehmann]</u>, 56 F.3d [750,] 757-58 [(7th Cir. 1995)]; <u>see also</u> <u>In re Slatkin</u>, 525 F.3d 805, 814-15 (9th Cir. [] 2008). The policy justification is ratable distribution of remaining assets among all the defrauded investors. The "winners" in the Ponzi scheme, even if innocent of any fraud themselves, should not be permitted to "enjoy an advantage over later investors sucked into the Ponzi scheme who were

not so lucky." In re United Energy Corp., 944 F.2d 589, 596 (9th Cir. 1991).

Donell, 533 F.3d at 770.

However, there are material differences between the Donell case and DeBoer's situation. First, the receiver in Donell was acting pursuant to a court order to locate the business's assets and hence was proceeding against all of the investors in the Ponzi scheme who had made a profit. Here, the FTC is not pursuing any of the 3,713 participants in the BurnLounge scheme who made a profit other than Taylor and DeBoer (despite the fact that the FTC purportedly has a spreadsheet listing everyone who participated and what they profited/lost). Second, the action/order in Donell was initiated pursuant to a California state statute (i.e. the Uniform Fraudulent Transfer Act, Cal. Civ. Code § 3439.04) which is not applicable herein. Third, the receiver in Donell had authorization to "bring such legal actions based on law or equity . . . as he deems necessary," while the FTC here can only seek equitable relief. The judgment against Kowell in Donell appears to be one at law because there were no particular funds that had to be surrendered. Notably, in Donell, the victims (whom the receiver represented) were referred to repeatedly as "creditors," but in Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213-14 (2002), the Court said essentially that there is no equitable relief for the claims of creditors - ("The basis for petitioners' claim is not that respondents hold particular funds that . . . belong to petitioners, but that petitioners are contractually entitled to some funds for benefits that they conferred. The kind of restitution that petitioners seek, therefore is not equitable . . . but legal . . . ."); but see FTC v. Direct Marketing Concepts, Inc., 648 F.Supp.2d 202, 213-14, 217-20 (D. Mass. 2009) (purporting to avoid granting a legal remedy, but ordering disgorgement in the amount of sales revenues as opposed to profits because it is "equivalent to the grant of a full purchase price refund to consumers.").

Here, the Court would order some level of disgorgement of profits from DeBoer. However, the problem is that the FTC has failed to establish with any precision what was the exact amount of the profit. While it is not disputed that DeBoer earned $908,293.69 from his BurnLounge endeavors, as a matter of equity the Court would allow him to deduct his expenses in obtaining those sums including: the amounts he expended in travel and similar costs, processing fees, taxes that he paid on that income, etc. Also, some of DeBoer's earnings would have been derived from the sale of music and other items which would not involve the improper sales of business opportunity giving rise to the sanctionable pyramid scheme.

In light of the above, the Court sets $150,000 as the disgorgement of profits amount with the expectation that the actual figure is certainly much higher, but the FTC has not established what the precise figure would be.

## III.   CONCLUSION

The Court finds by a preponderance of the evidence that: (1) Defendants BurnLounge and Arnold violated Section 5 of the FTC Act, 15 U.S.C. § 45(a), by creating and promoting a pyramid scheme; (2) that all of the Defendants engaged in deceptive acts or practices as described above in violation of Section 5 of the FTC Act; and (3) it is appropriate in the interests of justice for each Defendant to pay the amounts delineated herein.

Further, permanent injunctive relief is warranted pursuant to 15 U.S.C. §§ 45 and 53. Plaintiff FTC is ordered to amend and resubmit its [Proposed] Final Judgment and Order for Permanent Injunction and other Equitable Relief (Doc. Item No. 413-2) so as to conform with this Statement of Decision (including consideration of footnote 48, supra).

Dated: This  /st  day of July, 2011.

GEORGE H. WU
United States District Judge