Lawrence B. Steinberg (State Bar No. 101966)
*LSteinberg@buchalter.com*
BUCHALTER NEMER
A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-2457
Telephone: (213) 891-0700
Facsimile: (213) 896-0400

Attorneys for defendants BURNLOUNGE, INC. and JUAN ALEXANDER ARNOLD

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>BURNLOUNGE, INC., a corporation: JUAN ALEXANDER ARNOLD, an individual; JOHN TAYLOR, an individual; ROB DEBOER, an individual; and SCOTT ELLIOTT, an individual,<br><br>Defendants. | Case No. CV 07-3654 GW (FMOx)<br><br>DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; DECLARATION OF LAWRENCE B. STEINBERG<br><br>Date: August 28, 2014<br>Time: 8:30 a.m.<br>Courtroom: 10 |

Defendants BURNLOUNGE, INC. ("BurnLounge") and JUAN ALEXANDER ARNOLD (collectively, "Defendants") respectfully submit this memorandum regarding the issues remanded to this court by the Ninth Circuit:

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16815379_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ........ 1

II. PROCEDURAL HISTORY ........ 2

A. The Parties' Previous Positions Regarding How Monetary Relief Should Be Calculated. ........ 2

B. How this Court Calculated Its Monetary Award of $16.2 Million. ........ 4

(1) $29.95 Portion of Product Package Purchase Revenues. . ........ 5

(2) $100.00 Portion of Premium Product Package Purchase Revenues. ........ 6

(3) "BurnLounge Presents" Subscription Fee. ........ 7

(4) $300.00 Portion of VIP Product Package Purchase Revenues.. ........ 8

C. Decision by the Ninth Circuit. ........ 9

III. THE CALCULATION OF CONSUMER HARM ATTRIBUTABLE TO THE $29.95 PORTION OF THE PRODUCT PACKAGE PURCHASES IS FLAWED AND SHOULD BE RE-DONE AFTER AN EVIDENTIARY HEARING. ........ 10

A. The FTC Schedule From Which The Percentages Were Taken -- Exhibit 422, Table III -- Is Fatally Flawed and Contains Meaningless Data. ........ 11

B. There Is No Logical Relationship Between The Decision Of A Consumer To Purchase Ten (Or More) Downloaded Songs And The Decision To Purchase A Product Package. ........ 12

C. There Is No Logical Reason Why The Court Used A Different Formula For The $29.95 Revenue Stream Than The Formulas It Used For The $100 And $300 Revenue Streams. ........ 14

D. The Court's Decision To Apply The Same Formula To Three Disparate Groups Of Moguls (Who Purchased Three Different Levels Of Product Packages) Is Not Reasonable ........ 14

IV. THE AMOUNT OF CONSUMER HARM ATTRIBUTABLE TO THE BURNLOUNGE PRESENTS FEES SHOULD ALSO BE RE-CALCULATED. ........ 15

V. CONCLUSION ........ 17

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16835243_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This memorandum addresses two issues[1] which the Ninth Circuit has remanded to this court for further consideration, placing at issue $3.3 million of the $16.2 million monetary relief ordered by this court. The remanded issues pertain to two components of the methodology used by this court to quantify consumer harm in its July 1, 2011 "Statement of Decision" (Docket No. 431) ("S.D."): (1) the formula used by the court to determine that consumers suffered $1.4 million in harm attributable to sales of BurnLounge's Basic packages; and (2) the formula used by the court to determine that consumers suffered $1.9 million in harm attributable to the fees charged by BurnLounge for its "BurnLounge Presents" subscription. Mem. Decision (9th Cir. Jun 2, 2014) ("Mem.") at 5. The Ninth Circuit has requested that, with respect to these two issues, this court either "clarify the basis" for its calculations, or "redo the calculation." *Id.*

It is Defendants' position that this court's methodology with respect to these two elements of its monetary award was flawed, being based on data that has no logical relationship to the amount of consumer harm, using formulas which are inconsistent with each other, and failing to take into consideration certain indisputably relevant factors. Moreover, because the methodology used was created *de novo* by this court, and is a methodology which, until used by this court, was not referenced or discussed in any existing case law precedent, the parties did not take discovery or present evidence on the components of the mathematical formulas used by the court.

[1] The Ninth Circuit remanded a third issue, the amount of the disgorgement award to be assessed against defendant Rob DeBoer. This memorandum takes no position with respect to this third issue, which pertains exclusively to defendant DeBoer.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16815379_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION

Defendants request, as they did in the Joint Status Report filed on July 8, 2014 (Docket No. 549),[2] that they be permitted to take some very limited discovery (20 written interrogatories, followed by a half day deposition of FTC expert Peter Vander Nat), and then, after receiving supplemental briefs from the parties, that this court hold a one-half day hearing where the parties can present their evidence and arguments.

## II. PROCEDURAL HISTORY

Given the amount of time that has passed since trial and issuance of the Statement of Decision, Defendants present a summary of the proceedings regarding determination of the monetary award ordered by this court.

### A. The Parties' Previous Positions Regarding How Monetary Relief Should Be Calculated.

It is relevant to Defendants' request for discovery and an evidentiary hearing that, prior to issuance of the Statement of Decision, none of the parties argued for a methodology to quantify monetary relief that involved the factors ultimately used by this court, and none of the parties argued what would be an appropriate "proxy" for the amount of BurnLounge's revenues derived independent of the business opportunity.

At trial and in its post-trial filings, the FTC took the position that monetary relief should be ordered in the amount of $21.4 million which, essentially, represented the *gross revenues* received by BurnLounge from all Moguls who received less in commissions than they had paid to BurnLounge (the so-called "Net Losers"). In doing this calculation, the FTC, through its expert Peter Vander Nat, included all monies paid by Moguls to BurnLounge for any purpose (including

[2] At the July 10, 2014 telephonic status conference held in this matter, the court stated that, in this opening memorandum, they could renew their request to take limited discovery and that, at that time, the court would consider whether to proceed with the August 28, 2014 hearing, or take that hearing off calendar.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16815379_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION
2.

monies paid for product packages, monthly Mogul fees, monthly BurnLounge Presents fees, and purchases of music downloads).[3]

In their post-trial findings, Defendants, of course, vigorously contested liability. But they also advanced, in the alternative, a number of theories regarding the calculation of a monetary award (should one be ordered). Defendants' principal argument, rejected by this court, was that there was no consumer injury at all because the fair market value of the products included in the product packages exceeded what the Moguls paid to BurnLounge for those products.[4] In the alternative, however, Defendants argued that the only monies paid to BurnLounge which should be subject to disgorgement were the monthly Mogul fees paid by the Net Losers, which totaled $1,676,424.[5] Defendants' also argued that this $1,676,424 sum should be discounted to take into account the 44% of Moguls who never earned any commissions at all (and, thus, did not participate in the business opportunity), reducing the monetary award to $678,543. *Id*.

Significantly, this court did not adopt either the FTC's or Defendants' approach to how monetary relief should be calculated. Instead, the court, without prior notice to the parties, used a novel methodology, utilizing facts, numbers and ratios not presented by the parties, but determined solely and exclusively by the court. Now that the Court of Appeals has remanded certain portions of the monetary award for clarification and/or revision, the court should give the parties an opportunity -- for the first time -- to conduct some limited discovery, and to present evidence and testimony, as to how the calculations should be performed.

[3] See, FTC Proposed Findings of Fact and Conclusions of Law (Docket No. 395), ¶¶ 68; FTC Response to Defendants' Proposed Findings of Fact and Conclusions of Law (Docket No. 403) at 26, 29.

[4] See, Defendants' Final Post Trial Brief (Docket No. 407) at 27-29; Defendants' PowerPoint Presentation Presented at Closing Argument (Docket No. 417) at 13-15, 26.

[5] See, Docket No. 407 at 29; Docket No. 417 at 27-28.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16815379_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION

3.

B. How this Court Calculated Its Monetary Award of $16.2 Million.

In its July 1, 2011 "Statement of Decision" (Docket No. 431), the court rejected plaintiff's argument that the appropriate amount of disgorgement was equal to the $21.4 million calculated by the FTC as being the amount paid by the Net Losers to BurnLounge in excess of the commissions they received. The court also rejected Defendants' approach to quantifying monetary harm by giving credit for the fair market value of the product packages.

The approach taken by the court -- and not taken by any of the parties -- derives from the court's finding that "the motivation of consumers in purchasing the product packages is vital to the calculation of consumer harm." S.D. at 25. The court went on to note that neither party presented any evidence of the motivation of consumers, finding the positions of both the FTC and of Defendants to be unpersuasive. *Id*.

The court recognized that, contrary to the FTC's position, a necessary corollary of this principle was that a certain number of the BurnLounge Moguls must have found value in the product packages outside of the Mogul program, and would have purchased the packages, even if the Mogul program had not existed. S.D. at 25.[6]

The court recognized that, because none of the parties had approached the issue in the way that the court was approaching it, it did not have any evidence before it on the direct question of how many Moguls would have bought the various product packages had the business opportunity had not existed. *See*, S.D. at 25. Thus, the court proceeded to devise a way, with the data it already had, to estimate what portion of the monies paid to BurnLounge by Moguls represented products which would have been purchased irrespective of the business opportunity.

[6] This court stated, in its Statement of Decision: "[O]f those [BurnLounge Moguls] who purchased [one of the three product] package[s], with or without participating in the business [opportunity], a certain number must have found value outside of the Mogul program. That is, it can be inferred that at least some of the Moguls would have purchased the Basic Package even if the Mogul Program had not existed." S.D. at 25.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16815379_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION

4.

The court decided that each of the three types of BurnLounge product packages (Basic, Exclusive and VIP) should be treated with a *different formula*. Additionally, rather than using the total purchase price of each of the three product packages ($29.95, $129.95 and $429.95), the court, instead, broke the packages into pieces equal to the difference in price between each type of package, and the successively more expensive packages ($29.95, $100.00, and $300.00), and used these dollar figures to do its calculations. [7]

Here are the four formulas that the court used in its Statement of Decision with respect to the four different revenue streams paid to BurnLounge by Moguls:

(1) <u>$29.95 Portion of Product Package Purchase Revenues</u>. With respect to the first $29.95 of each of the product package purchase prices (the $29.95 Revenue Stream"), the court, starting with the total of 60,270 Moguls, subtracted out the 3,713 Moguls who were Net Winners, and then also subtracted out the 3,323 Moguls who purchased product packages after April 2007 (when BurnLounge detached the business opportunity from the requirement to purchase a product package), concluding that 53,234 Moguls[8] suffered consumer harm. The court then devised a ratio from an FTC chart purporting to summarize purchases by what the chart erroneously characterizes as "All Non-Moguls). [As discussed below, this chart -- Exhibit 422, Table III -- *consists of fatally flawed and meaningless data*.] From this chart, the court takes a figure which purports to quantify the percentage of Non-

[7] There is no evidence in the record which distinguishes among the three packages in this manner. This approach of dividing the data in this way ($29.95, $100.00, and $300.00) was *uniquely devised by this court*, and was not done by any witness. The only other place that the data was divided in this fashion was <u>Exhibit 330</u> -- the Master Spreadsheet -- which represents nothing more than the way that BurnLounge tracked its revenue for internal accounting purposes.

[8] 60,270 Moguls, minus the 3,713 Moguls who were Net Winners, minus the 3,323 Moguls who purchased product packages after BurnLounge detached the business opportunity from the requirement to purchase a product package, results in 53,234 Moguls who, in the court's view, suffered consumer harm.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16815379_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION
5.

Moguls who purchased $9.90 or more of Music Downloads (31.7%) and multiply that percentage by a figure which purports to quantify the percentage of Non-Moguls who purchased any one of the three product packages (3.4%). In doing this multiplication, the court made a *mathematical error*, coming up with 10.8%. (The actual multiplication, which in any event is meaningless because it is based on flawed data, should have resulted in 1.08%.)[9] Working with the 10.8% figure, the court then reasoned that the complement of this percentage (89.2%) represented the percentage of revenues collected from Moguls for the Basic Package that was not motivated by an intent to purchase the products, multiplied this percentage by the 53,234 Moguls who suffered consumer harm, and multiplied this figure by $29.95. The net result of the above mathematics is deemed consumer harm of $1,422,168. *See*, S.D. at 25-26. *This calculation is one of the two calculations that the Ninth Circuit has remanded for clarification, and/or to be re-done, stating that "it is not clear why the district court based its proxy on the number of non-Moguls who bought at least one album*." *See*, Mem. at 5.

(2) <u>$100.00 Portion of Premium Product Package Purchase Revenues</u>. With respect to the next $100.00 of the product package purchase prices for the Exclusive and VIP product packages (the $100 Revenue Stream"), the court used an entirely different methodology. For this component of BurnLounge's revenues, the court started with the total number of premium (Exclusive and VIP) packages sold (57,752), and subtracted out the 3,713 Moguls who

[9] The Ninth Circuit picked up on this mathematical error. *See*, Mem. at 5 fn. 2.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16815379_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION

6.

were Net Winners, concluding that 54,039 of these Moguls suffered consumer harm.[10] The court then derived a different ratio, using the percentage of non-Mogul Retailers who purchased one or the other of the two premium packages (34.5%) as a proxy for determining the percentage of Moguls who purchased the Exclusive package for the value of the products received rather than for the business opportunity. The court then took the complement of this percentage (65.5%), multiplied this percentage by the 54,039 Moguls who it deemed to have suffered consumer harm, and multiplied this figure by $100.00. The net result of the above mathematics is deemed consumer harm of $3,539,555.

*See*, S.D. at 26. *The Ninth Circuit affirmed this calculation,* holding that "it was not an abuse of discretion to use the percentage of non-Moguls who purchased Exclusive and VIP package[s] as a proxy for the percentage of Moguls who would have found value in those packages to purchase one without the opportunity to earn cash rewards." Mem. at 4-5.

(3) <u>"BurnLounge Presents" Subscription Fee</u>. With respect to the $2,912,040 in revenue ("BLP Revenue Stream") paid to BurnLounge by Net Losers for the monthly BurnLounge Presents subscriptions fees ("BLP Fees"), the court determined consumer harm by multiplying this revenue by the same 65.5% percentage (described above) that it used in connection with the $100.00 portion of the premium product package purchases, arriving at deemed consumer harm of $1.9 million. However, by using the

[10] For some reason, the court did not make any adjustment for the 3,323 product packages purchased after April 2007, when BurnLounge detached the business opportunity from the requirement to purchase a product package.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16815379_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION

7.

gross dollar amount of BLP Fees, *the court made no adjustment for BLP Fees paid by persons who purchased their product packages after April 2007* (when BurnLounge detached the business opportunity from the requirement to purchase a product package). *See*, S.D. at 26. *This calculation is the second calculation that the Ninth Circuit has remanded for further explanation*. *See*, Mem. at 5.

(4) <u>$300.00 Portion of VIP Product Package Purchase Revenues</u>. With respect to the $300.00 portion of the purchase price for VIP product packages (the $300 Revenue Stream"), the court used a different proxy, this time using the percentage of Non-Moguls who purchased a VIP package (17.3%) as a proxy for the proportion of Moguls who purchased a VIP package for the value of the products, rather than for the business opportunity. For this component of BurnLounge's revenues, the court started with the total number of VIP packages sold to Moguls (40,393), and subtracted out the 2,599 Moguls who it deemed to be Net Winners, concluding that 37,794 of these Moguls had suffered consumer harm.[11] The court then took the complement of the percentage it used as a proxy (82.7%), multiplied this percentage by the 37,794 Moguls who it deemed to have suffered consumer harm, and multiplied this figure by $300.00. The net result of the above mathematics is deemed additional consumer harm suffered by VIP moguls of $9.4 million. *See*, S.D. at 26. *The Ninth Circuit also affirmed the methodology used for this calculation. See,* Mem. at 4-5.

[11] For some reason, the court, again, did not make any adjustment for the VIP product packages purchased after April 2007, when BurnLounge detached the business opportunity from the requirement to purchase a product package.

C. Decision by the Ninth Circuit.

On June 2, 2014, the Ninth Circuit ruled on Defendants' appeal, affirming this court's determination of liability with respect to its finding that BurnLounge was operating an illegal pyramid scheme. *FTC v. BurnLounge*, 753 F.3d 878, 888 (9th Cir. 2014).

In a concurrently issued unpublished memorandum opinion, the appeals court affirmed this court with respect to a number of additional issues. The Ninth Circuit panel understood, and ratified, this court's decision to identify appropriate "proxies" so that it could determine the revenues paid to BurnLounge by Moguls "who would have found enough value in [the BurnLounge product] packages to purchase [a product package] without the opportunity to earn cash rewards." *See*, Mem. at 4-5. But the appeals court did have concerns regarding how that decision was implemented with respect to two portions of the methodology used in calculating: consumer harm deriving from the $29.95 component of the purchase price of the product packages; and consumer harm deriving from the payment of BLP Fees.

Specifically, in connection with the $29.95 component of the purchase price of the three types of product packages, the Court of Appeals did not understand why the percentage of non-Moguls who bought at least one album of downloaded music was an appropriate proxy. *See*, Mem. at 5 ("It is not clear why the district court based its proxy on the number of non-Moguls who bought at least one album."). Accordingly, the Ninth Circuit remanded that issue so that "the district court [could] clarify the basis for the calculation of consumer harm it attributed to sales of BurnLounge's Basic packages *or to redo the calculation*" (emphasis added).[12]

[12] The Ninth Circuit also made note of a mathematical error made in connection with this calculation. But the appellate court's concern about the appropriateness of the proxy used by the district court clearly went beyond the mathematical error. Had the mathematical error been the Ninth Circuit's only concern, the court would have simply corrected the math mistake and would have modified the judgment accordingly. There would have been no reason for a remand simply to correct an error of multiplication.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16815379_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION
9.

Second, the Ninth Circuit had a concern with how the portion of the monetary award pertaining to BLP Fees was calculated. Though the Memorandum Opinion does not contain any explanation as to why the panel had this concern, the opinion does remand that issue as well so that this court can "explain" what it did and why.

## III. THE CALCULATION OF CONSUMER HARM ATTRIBUTABLE TO THE $29.95 PORTION OF THE PRODUCT PACKAGE PURCHASES IS FLAWED AND SHOULD BE RE-DONE AFTER AN EVIDENTIARY HEARING.

As discussed above, this court determined that the best available proxy for the number of Moguls who found enough value in the Basic package was the percentage of non-Moguls who purchased at least one album, which the court determined, referencing Exhibit 422, as being 31.7%. S.D. at 25. The Ninth Circuit observed that "[i]t is not clear why the district court based its proxy on the number of non-Moguls who bought at least one album." The appeals court remanded to this court "to clarify the basis for the calculation of consumer harm it attributed to sales of BurnLounge's Basic packages or to redo the calculation." This component constitutes $1,444,168 of the monetary award made by this court.

As discussed in this section, this court's methodology and calculation with respect to the $29.95 Revenue Stream does not provide a reasonable proxy for consumer harm for the following reasons: (1) the FTC schedule from which the figures were derived (Exhibit 422, Table III) is fatally flawed; (2) there is no logical relationship between the decision of a consumer to purchase a product package, and the decision of a consumer to purchase ten (or more) downloaded songs; (3) there is no logical reason why the court should have used a different formula for the $29.95 Revenue Stream than the formulas it used for the $100 and $300 Revenue Streams; and (4) the court's decision to apply the same formula to three disparate groups of

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16815379_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION
10.

Moguls (who purchased three different levels of product packages) is not reasonable.

A. The FTC Schedule From Which The Percentages Were Taken -- Exhibit 422, Table III -- Is Fatally Flawed and Contains Meaningless Data.

The foundation of this court's calculation of $1,444,168 of consumer harm deriving from the $29.95 Revenue Stream is a portion of a document compiled by the FTC's expert, Peter Vander Nat ("Vander Nat"): Exhibit 422, Table III (attached as Exh. 422 to Steinberg Decl.). This is the chart from which the court took the two percentage figures used in its calculation, to wit, the 3.4% figure for the percentage of non-Moguls who purchased a product package, and the 31.7% figure for the percentage of non-Moguls who purchased $9.90 (or more) of music downloads. *See*, S.D. at 25.

Vander Nat took the numbers used to calculate these percentages from Exhibit 330 (the Master Spreadsheet), which is an Excel spreadsheet produced by BurnLounge in discovery, containing a "data dump" of all of the accounting data contained in its customer database. Steinberg Decl., ¶ 6; Trial Tr., Day 4, PM session, at 74:18-21, 84:25-85:8, 87:2-5 (attached as Exh. 1 to Steinberg Decl.); Trial Tr., Day 5, AM session, at 26:16-27:13 (attached as Exh. 2 to Steinberg Decl.).

As demonstrated at trial during Defendants' cross-examination of Vander Nat, and as even noted by the court when Judge Wu himself asked questions on this subject of Vander Nat, the percentage figures contained on Exhibit 422, Table III are meaningless because *they are based on the false premise that BurnLounge had economic transactions with 57,997 non-Moguls*. *See*, Trial Tr., Day 6, AM session, at 26:10-14, 27:4-10, 29:2-7, 29:15-21, 45:1-2, 47:8-12 (attached as Exh. 3 to Steinberg Decl.).

However, of the 57,997 rows of data shown on this tab of the Master Spreadsheet, *more than half of those rows contain nothing but zeroes*, indicating a

*potential* customer, but *showing that 29,746 of those persons never bought anything from BurnLounge*. See, Steinberg Decl., ¶ 8(b); Trial Tr., Day 6, AM session, at 23:18-24:14, 27:23-28:11, 29:15-21 (attached as Exh. 3 to Steinberg Decl.).

A portion of this Master Spreadsheet was marked at trial as Exhibit 1167, and clearly demonstrates that the data is not what Vander Nat assumed it to be. *See*, Steinberg Decl., Exh. 330 (Excel spreadsheet; manually filed with court), Exh. 1167 (10 page excerpt from Master Spreadsheet, showing many rows with all zeroes and no economic transaction of any kind).

Vander Nat admitted that he noticed all of these zeroes, but that he did not make any adjustment, instead blithely assuming a universe of 57,997 non-Mogul customers when he knew full well that it was not appropriate to use this number as the denominator in his calculations. *See*, Trial Tr., Day 6, AM session, at 24:7-14, 25:7-14, 26:10-14, 27:4-10 (attached as Exh. 3 to Steinberg Decl.).

And finally, to state the obvious, if the 29,746 persons who were incorrectly included in the percentage calculations on Exhibit 422, Table III, were removed from Vander Nat's analysis, all of the percentage figures on that schedule would have to be adjusted, and they would be very different. *See*, Trial Tr., Day 6, AM session, at 31:4-25 (Vander Nat: "If you excluded all of [the people who had zeroes], it would be a very different [percentage]") (attached as Exh. 3 to Steinberg Decl.).

B. There Is No Logical Relationship Between The Decision Of A Consumer To Purchase Ten (Or More) Downloaded Songs And The Decision To Purchase A Product Package.

Separate and apart from the intrinsic fallacy of the numbers used to calculate the $1,444,168 of consumer harm deriving from the $29.95 Revenue Stream, there is a separate, but equally important, problem regarding the logic of using these two numbers as a "proxy" for consumer harm.

The purpose, according to the Statement of Decision, of devising a formula in the first place is because neither party presented any evidence of the motivation

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16815379_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION
12.

of consumers in making their purchases.  *See*, S.D. at 25.  Given this absence of evidence, the court decided that it needed to make certain logical associations from the data it had.

The principal approach used by this court was to use the 1,980 non-Moguls who purchased a product package as a "control group" since, as a non-Mogul who had decided not to participate in the business opportunity, those persons, by definition, decided to purchase the product packages without regard to any influence of the business opportunity.  This is the "proxy" that this court used with reference to consumer harm resulting from the $100 Revenue Stream and the $300 Revenue Stream and, in fact, the Ninth Circuit endorsed this logic. *See,* Mem. at 4-5.[13]

But there is no similar logical relationship between the decision of a Mogul to buy a product package and the decision of a non-Mogul to purchase 10 or more songs of downloaded music.

And, in fact, at trial, *FTC expert Vander Nat admitted that there is no logical relationship between the decision to buy downloaded music and the decision to buy a product package*.  See, Trial Tr., Day 5, AM session, at 28:12-16  (Vander Nat: "And the album sales, now they show a significantly different result, roughly 31, 32 percent of the non moguls did buy the musical albums which I would expect because -- let me put it this way. I have no expectation about that particular percentage") (attached  as Exh. 2 to Steinberg Decl.).

Accordingly, the court should devise a different type of proxy in order to quantify the amount of consumer harm attributable to the $29.95 Revenue Stream.

---

[13]  "It was not an abuse of discretion to use the percentage of non-Moguls who purchased Exclusive and VIP package as a proxy for the percentage of Moguls who would have found enough value in those packages to purchase one without the opportunity to earn cash rewards."

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16815379_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING
ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION
13.

C. There Is No Logical Reason Why The Court Used A Different Formula For The $29.95 Revenue Stream Than The Formulas It Used For The $100 And $300 Revenue Streams.

As discussed above in some detail, the court devised one type of "proxy" in calculating consumer harm for the $100 Revenue Stream and the $300 Revenue Stream, and a completely different logic and "proxy" when it quantified consumer harm resulting from the $29.95 Revenue Stream.

Specifically, with respect to the $100 Revenue Stream and the $300 Revenue Stream, the court used, as a "control group," the purchase patterns of the 1,980 persons who purchased a product package but, as a non-Mogul, elected to not participate in the business opportunity. This approach was affirmed by the Ninth Circuit, which ruled that using this type of "proxy" was not an abuse of discretion. *See*, Mem. at 4-5.

Without endorsing this particular proxy, and reserving its rights to argue in favor of a different approach after having the opportunity to take some discovery on these issues, Defendants do note, as a matter of mathematical exercise, that applying the same "proxy" to the $29.95 Revenue Stream would result in a reduction of calculated consumer harm from $1,422,168 to $550,054. The details of this calculation are shown in the footnote.[14]

D. The Court's Decision To Apply The Same Formula To Three Disparate Groups Of Moguls (Who Purchased Three Different Levels Of Product Packages) Is Not Reasonable

The logic and mathematics underlying this court's determination of the $1,422,168 in consumer harm suffers from another important logical flaw.

The calculation seems to assume that the 53,234 BurnLounge Moguls used in the calculation are a homogeneous group, but that, according to important portions of this court's Statement of Decision, is clearly not the case.

---

[14] Taking data from Exhibit 422, Table I, 65.5% of non-Moguls who purchased a product package of any type elected to purchase the Basic Package. Calculating putative consumer harm from the complement of this percentage (34.5%), the calculation is as follows: 53,234 Moguls x $29.95 x 34.5%, equals calculated consumer harm of $550.054.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16815379_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION
14.

Specifically, what the 53,234 includes are, portions of the revenue paid by Moguls who purchased the VIP Package (for $429.95), portions of the revenue paid by Moguls who purchased the Exclusive Package (for $129.95), and all of the revenue paid by Moguls who purchased the Basic Package (for $29.95).

Very important portions of this court's decision, and of the Ninth Circuit's decision affirming this court's conclusion that BurnLounge was an illegal pyramid, are premised on qualitative differences between these three categories of Moguls. Specifically, the court reasoned that Moguls who purchased either a VIP Package or an Exclusive Package, under the terms of BurnLounge's compensation plan gave those Moguls the opportunity to more quickly collect higher commissions, allowed them to bypass the album sales requirements to obtain higher Mogul Team Bonuses. From this, the Statement of Decision concludes that the difference in compensation requirements between a Mogul who purchased a Basic Package, on the one hand, and a premium package, on the other hand, "created a reason for prospective Moguls to purchase a premium package regardless of the value received from the products bundled within it." S.D. at 22-23.

Thus, the Court's own decision emphasizes that Basic Package Moguls are qualitatively and significantly differentiated from Moguls who bought a premium package in a way that is directly relevant to the quantification of consumer harm, that being the extent that the Mogul's purchase decision was motivated by the business opportunity. Given this difference, it seems that the court should not lump all of these Moguls together when it quantifies consumer harm.

## IV. THE AMOUNT OF CONSUMER HARM ATTRIBUTABLE TO THE BURNLOUNGE PRESENTS FEES SHOULD ALSO BE RE-CALCULATED.

Finally, the Ninth Circuit remanded to this court the issue of the consumer harm arising from the BLP Revenue Stream. BurnLounge Presents was a product included with the Exclusive Package and the VIP Package. For an $8.00 monthly fee, Moguls who purchased a premium package were sent, each month, a monthly

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16815379_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION
15.

DVD containing music videos, and were provided a monthly bundle of 10 songs specifically selected by BurnLounge's A&R Department. *See*, S.D. at 4.

In calculating the $1,907,386 in consumer harm which the court has attributed to the BLP Revenue Stream, the court simply took the aggregate amount of BLP Fees paid to BurnLounge by Net Losers ($2,912,040), and multiplied that dollar figure by the same 65.5% percentage it used in connection with the $100 Revenue Stream. In using this percentage, the court reasoned that it was appropriate to use the same proxy because the BLP program was tied to persons who purchased a premium package. *See*, S.D. at 26.

Though the Court of Appeals, with respect to the consumer harm arising from the BLP Revenue Stream, has asked this court to "explain" its calculation, the court should use this opportunity to refine this component of its quantification of consumer harm. Specifically, unlike the methodology that it used it connection with determining consumer harm arising from the $29.95 Revenue Stream, the court, here did not make any adjustment to take into account BLP Fees paid by all Moguls after April 2007, when BurnLounge detached the business opportunity from the requirement to purchase a product package. In order for the court's methodology to be consistently applied, such an adjustment should be made here.

Moreover, the FTC has admitted in binding judicial admissions that any damages award should be reduced by the value of the products provided to Moguls. *See*, Exhibit 1127 [FTC Answers to Interrogatories Nos. 19 & 47] (" . . . monetary remedy calculated by aggregating losses of mogul participants who lost money . . . minus the amount of money they received from BurnLounge in the form of bonuses and commissions *minus the value of products that they received from BurnLounge for their payments to participate*") (attached as <u>Exh. 1127</u> to Steinberg Decl.).

The FTC's concession that Defendants are entitled to a credit for the value of the BurnLounge Presents products prevents it from taking a contrary position now. *See e.g.*, *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224 (9th Cir. 1988)

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16815379_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION

16.

(formal admissions made in pleadings and discovery are binding and have the effect of removing issues from dispute); *Int'l Intellectual Mgmt. Corp. v. Lee Yunn Enters. (U.S.A.)*, 2009 U.S. Dist. LEXIS 118448, fn. 47 (C.D. Cal. 2009).

Accordingly, this court should take advantage of the remand on this issue, and make appropriate adjustments to the $1,907,386 in consumer harm which it attributed to the BLP Revenue Stream by reducing the damages figure to account for BLP Fees paid after BurnLounge detached the business opportunity from the requirement to purchase a product package, and by giving appropriate credit for the value of the BLP products.

## V. CONCLUSION

For the foregoing reasons, and as discussed above, the court, for reasons of fairness and due process, should allow Defendants an opportunity to take limited discovery, and then present evidence and testimony regarding the two issues remanded to this court by the Ninth Circuit. Given that the methodology used by the court in quantifying consumer harm was a novel and new methodology, Defendants have never had an opportunity to discover and present these issues regarding what the appropriate proxies and calculations are with respect to these two portions of the monetary award.

DATED: August 6, 2014

BUCHALTER NEMER
A Professional Corporation

By /s/
Lawrence B. Steinberg
Attorneys for defendants BURNLOUNGE, INC. and JUAN ALEXANDER ARNOLD

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES
16815379_1.DOCX

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING ISSUES REMANDED BY NINTH CIRCUIT; STEINBERG DECLARATION
17.