JONATHAN E. NUECHTERLEIN
General Counsel

CHRIS M. COUILLOU
        ccouillou@ftc.gov
Federal Trade Commission
225 Peachtree Street, NE, Suite 1500
Atlanta, GA 30303
(404) 656-1353 (Couillou)
(404) 656-1379 (Fax)

BURKE W. KAPPLER
        bkappler@ftc.gov
Federal Trade Commission
600 Pennsylvania Avenue, NW, H-586
Washington, DC 20580
(202) 326-2043 (voice)
(202) 326-2477 (fax)

THOMAS SYTA, California Bar # 116286
        tsyta@ftc.gov
Federal Trade Commission
10877 Wilshire Blvd., Ste. 700
Los Angeles, CA  90024
(310) 824-4318 (voice)
(310) 824-4380 (fax)

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. CV 07-3654 GW (FMOx) |
| Plaintiff, | |
| vs. | PLAINTIFF FEDERAL TRADE COMMISSION'S REPLY BRIEF CONCERNING DIRECTIONS IN THE NINTH CIRCUIT'S REMAND |
| BURNLOUNGE, INC., a corporation: JUAN ALEXANDER ARNOLD, an individual; JOHN TAYLOR, an individual; ROB DEBOER, an individual; and SCOTT ELLIOTT, an individual, | |
| Defendants. | |

1

**TABLE OF CONTENTS**

2

3      I.      Introduction .............................................................................. 1

4      II.     Argument .................................................................................. 1

5
               A.      DIRECTION 1.  "[T]he district court [should] clarify the
6                      basis for the calculation of consumer harm it attributed to
7                      sales of BurnLounge's Basic packages or redo the
                       calculation." *Id.* ............................................................ 2
8
                       1.      The District Court's calculation does not depend on
9                              any allegedly "flawed" data. .................................. 2

10
                       2.      The District Court's rationale in calculating
11                             consumer harm from Basic packages was reasonable
12                             and most favorable to Defendants. ....................... 3

13
                       3.      The District Court's use of different proxy formulas
14                             for the Basic package and the premium packages
15                             was consistent with its findings related to value. ............. 6

16
                       4.      The District Court's calculations reasonably
17                             followed BurnLounge's own chosen business record
                               keeping structure. ................................................. 7
18
               B.      DIRECTION 2:  "[T]he district court [should] explain the
19                     'BurnLounge Presents' fee portion of the consumer harm
20                     calculation." *BurnLounge,* 2014 U.S. App. LEXIS 12685,
                       at *6. ............................................................................ 9
21
       III.    Conclusion ............................................................................ 10
22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*FTC v. BurnLounge, Inc.*, 2014 U.S. App. LEXIS 10152, 2014 Trade
   Cas. (CCH) P78 (9th Cir. June 2, 2014) ..................................................... 2

*FTC v. BurnLounge, Inc.*, 2014 U.S. App. LEXIS 12685, 2014-1 Trade
   Cas. (CCH) P78 (9th Cir. June 2, 2014) .......................................... 1, 2, 8, 9

*FTC v. BurnLounge, Inc*., No. CV 07-3654-GW (FMOx) (C.D. Cal.
   July 1, 2011) ..................................................................................... passim

*Mendez-Gutierrez v. Gonzales*, 444 F.3d 1168, 1172 (9th Cir. 2006) ............. 9

*United States v. Pimentel*, 34 F.3d 799, 800 (9th Cir. 1994) ........................... 9

1  **I.      Introduction**

2         In its remand, the Court of Appeals gave three simple directions to this

3  Court.  Two of the directions concerned the monetary equitable relief awarded

4  against Defendants BurnLounge and Arnold.[1]  Those directions ask this Court

5  to clarify the basis of its reasoning, or as to one calculation in which the Ninth

6  Circuit observed a math error, to "redo" the calculation.  Defendants' brief

7  does nothing to assist this Court in answering the Court of Appeals' requests

8  for clarification.  Instead, seizing on the word "redo," Defendants argue for

9  nothing less than reconsideration, asking this Court to re-open discovery and

10  permit additional argument on facts and issues that – as Defendants' own brief

11  amply shows – were already discovered, presented at trial, and decided by this

12  Court.  Because Defendants' arguments attack the Court's approach that the

13  Ninth Circuit already affirmed, misconstrue the Court's method of estimation,

14  and exceed the scope of the remand, the Court should reject their arguments

15  and enter the proposed response to the Court of Appeals provided by the FTC

16  with its initial brief.

17  **II.     Argument**

18         In their opening remand brief (hereinafter "Dkt. 560"), Defendants

19  Arnold and BurnLounge ("Defendants") purport to address two directions in

20  the remand to this Court.  Those directions are: (1) "[T]he district court

21  [should] clarify the basis for the calculation of consumer harm it attributed to

22  sales of BurnLounge's Basic packages or redo the calculation."  *FTC v.*

23  *BurnLounge, Inc.*, 2014 U.S. App. LEXIS 12685, at *6, 2014-1 Trade Cas.

24  (CCH) P78, 787 (9th Cir. June 2, 2014) (mem. op.); and (2) "[T]he district

25  court [should] explain the 'BurnLounge Presents' fee portion of the consumer

26  harm calculation."  *Id.*  Plaintiff addresses Defendants' arguments as to each

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
        [1] The Court of Appeals' third direction relates to defendant Robert
28  DeBoer, who did not file a brief regarding the remand, and Defendants Arnold
    and BurnLounge did not address that third direction in their brief.

remand direction in the order of their presentation in their brief.

A.    **DIRECTION 1.   "[T]he district court [should] clarify the basis for the calculation of consumer harm it attributed to sales of BurnLounge's Basic packages or redo the calculation."** *Id.*

Defendants make four arguments to support their claim that the Court's estimate of harm is flawed and should be redone.  None of these has merit.

1.    **The District Court's calculation does not depend on any allegedly "flawed" data.**

Defendants argue that the Court's calculation is problematic because the Court derived it from Ex. 422, which according to Defendants is "fatally flawed."  Dkt. 560 at 10.  According to Defendants, the flaw arises from Table III of Ex. 422 (*id.*), which sets forth calculations of percentages of all non-Moguls that fit into certain categories of purchases and non-purchases based on data from the Master Spreadsheet (Ex. 330).  Defendants claim that the problem with Table III of Ex. 422 is that it includes many non-Moguls who were identified in Ex. 330 as having made no purchases from BurnLounge at all, and thus their entries on the exhibit show only zeroes.  This observation -- which Defendants trumpet as a revelation but which was nonetheless discussed at length during trial[2] -- has no bearing on the Court's calculation of harm flowing from purchases of the Basic packages because the Court's

_____

[2] Defendants' brief attaches the trial transcript in which Dr. Peter Vander Nat was cross-examined at length on this issue.  Dkt. 560-4. Defendants use this transcript to attack Dr. VanderNat's credibility, suggesting that "he knew full well that [including data about non-Moguls] who were not customers was not appropriate."  Dkt. 560 at 12.  Actually, Dr, VanderNat used BurnLounge's own business records, which assigned account numbers to such non-Moguls.  *See* Ex. 330 (physically filed by Defendants) and Ex. 1167 (filed as Dkt. 560-7).  He accurately labeled Table III of Ex. 422 and clearly testified that he was aware that BurnLounge's data from the "Master Spreadsheet" (Ex. 330) included non-Moguls who had been assigned account numbers but did not make any purchases from BurnLounge.  Dkt 560-4 (11 RT 25-29).  Defendants' accusation that he knowingly did something inappropriate is completely unfounded.  In any event, the Ninth Circuit found Dr. Vander Nat's expert testimony to be "relevant and reliable."  *FTC v. BurnLounge, Inc.*, 2014 U.S. App. LEXIS 10152, at *4, 2014 Trade Cas. (CCH) P78, 786 (9th Cir. June 2, 2014).

2

1    calculation does not concern non-Moguls who made no purchases.  *FTC v.*

2    *BurnLounge, Inc*., No. CV 07-3654-GW (FMOx), slip op. at 25-26 (C.D. Cal.

3    July 1, 2011) [hereinafter "Dkt. 431"].  The proxy calculation only concerns

4    non-Moguls who purchased at least one album and non-Moguls who

5    purchased at least a Basic package.  Although the Court used percentages of

6    all non-Moguls (respectively 31.7% and 3.4%) to represent these two groups

7    (*id.* at 25), the fact remains those groups contain by definition a specific

8    number of individuals who made the purchases described.  As a result, the

9    Court did not even consider non-Moguls who made no purchases, so

10   Defendants' argument is irrelevant and completely without basis.

11          **2.      The District Court's rationale in calculating consumer
                     harm from Basic packages was reasonable and most
12                   favorable to Defendants.**

13          The Court's proxy calculation for Basic packages relied on data of

14   purchases of non-Moguls of albums and packages.  Defendants argue the

15   Court's calculation is problematic because there is no logical relationship

16   between the decision to purchase an album and the decision to purchase a

17   package. Dkt. 560 at 12-13.  Plaintiff disagrees.  A connection exists between

18   the purchases from BurnLounge of albums of digital music and packages.

19   Beside the fact that the offers to sell were made by BurnLounge and they were

20   music related, the non-Moguls who made purchases of albums and packages

21   had knowledge of BurnLounge.  That is the consideration of import, and no

22   further logical connection is required.  By choosing non-Mogul album

23   purchasers, the Court sought to establish a comparison group of non-Moguls

24   from which to observe the incidence of package purchasing and to use that as

25   a proxy for Moguls' behavior.  Album purchasers had shown an interest in

26   BurnLounge by making a purchase from it and their knowledge of

27   BurnLounge is the justification for their use as a comparison group.

28          The Court sought to calculate the "number [of Moguls] who found

                                          3

1   value outside of the Mogul program" by determining the rate of package

2   purchasing among non-Moguls who bought at least one album and to use the

3   complement of that rate of purchase as a proxy for Mogul behavior to

4   calculate a "rough estimate" of the harm to Moguls.  To estimate the non-

5   Mogul purchase rate, the Court assumed that all package purchasers bought at

6   least an album.  Dkt. 431 at 25 ("these groups overlapped completely").  This

7   was a reasonable assumption given Defendants describe the customers of their

8   packages as "music fans and musicians" (Appellants' Appeal Brief, p. 1 [Dkt.

9   559-4]), and the packages included a BurnPage through which music and

10  related packages and merchandise could be sold.  Dkt. 431 at 3-4.  As a result,

11  the Court determined that – based on the corresponding percentages of non-

12  Moguls who bought packages and albums – 10.8% of non-Moguls album

13  purchasers would have also purchased a package.  The Court used this

14  percentage as a proxy for Moguls who "would have found enough value in the

15  Basic Package to purchase it absent the Mogul program." *See id.* at 25.

16       The facts show, however, that the assumption was more favorable to

17  Defendants than experience justified.  A detailed examination of Ex. 330

18  reveals that there was not a complete overlap between those non-Moguls who

19  purchased at least one album and those non-Moguls who purchased a

20  package.  Instead of 10.8%, only 1.46% (as shown below), or 268 non-Mogul

21  album purchasers also purchased a package.[3]  This difference, however, does

22  not call the Court's reasoning or analysis into question.  To the contrary, it

23  provides even more support to the Court's finding that the Basic package only

24  had "nominal value absent the opportunity to earn money." *Id.* at 7.  This is

25  true because it shows that interest in BurnLounge packages absent the Mogul

26  opportunity was even lower than the Court's calculation assumed.  This data

27  also strongly supports the Court's conclusion, in calculating harm from the

28  _____

        [3] *See* Declaration of Chris M. Couillou (attached).

sales of the Basic package, to allow only a small deduction from the harm calculation to reflect those Moguls who would have purchased that package absent the opportunity to earn money. Indeed, at most, this data shows that the Court's assumption was overly generous to Defendants. As it stands, the Court found that a deduction of 10.8% of the revenues was appropriate.[4] *See id.* at 25-26. If the fact that only 268 of non-Mogul album purchasers also purchased a package were taken into consideration in making the harm estimate, the Court would have been justified in making an even smaller deduction, with a commensurately larger estimate of harm, as follows:

$$\frac{\text{\# of non-Moguls who purchased a package and at least one album}}{\text{\# of non-Mogul who purchased at least one album } [31.7\% \times 57,997]} = \frac{268}{18,385} = 1.46\%$$

Substituting this result into the Court's harm equation gives the following result: $29.95 \times 53,234 \times (100\% - 1.46\%) = \$1,571,080.67$.

Comparing this calculation to the Court's original calculation:

$29.95 \times 53,234 \times (100\% - 10.8\%) = \$1,422,167.60$

shows that the corrected data increases the harm calculation by $148,913.07. In addition to showing that an even higher harm calculation would be justified, the calculation demonstrates that the Court's assumption that the groups of non-Moguls who purchased at least a Basic package and those who purchased at least one album "overlapped completely" (Dkt. 431 at 25) was an assumption most favorable to Defendants. If the Court chooses to "redo the calculation" of its estimate of injury from sales of the Basic package as Defendants insist, it must use BurnLounge's own data about the true number of non-Moguls who purchased a package and at least one album.

---

[4] Plaintiff submitted a corrected calculation in its earlier brief using division that resulted in what amounts to a deduction of 10.73% of sales revenue. Dkt. 559 at 4.

### 3.     The District Court's use of different proxy formulas for the Basic package and the premium packages was consistent with its findings related to value.

The Court used the same approach for calculating harm from the sales of all three BurnLounge packages.  Specifically, it multiplied the number of Moguls who purchased each package by the incremental additional price paid for the package (Basic-$29.95, Exclusive-$100, and VIP-$300) by a percentage that the Court established as a proxy for the number of Moguls would not have bought the package absent the Mogul program.  The precise formulas for the calculation of the proxies differed between the Basic and the premium packages to the extent that the comparison group used for Basic package was non-Moguls who purchased at least one album, and for the premium packages, it was non-Moguls who purchased any package.  Contrary to Defendants' claim that there was no logical reason for the Court to use these different proxy formulas, there were at least two logical reasons to alter the formulas.  First, the Court recognized that the "premium product packages did have some tangible value."  Dkt. 431 at 26.  In comparison, the Court found the Basic package had only "nominal value absent the opportunity to earn money."  *Id.* at 25.  In addition, in adopting the harm formula for the Exclusive package, the Court said that it was giving Defendants a "generous benefit of the doubt."  *Id.* at 26.  It made no similar statement regarding the calculation of harm from the sales of Basic package.  In light of these statements, it is not surprising that the Court used a slightly different proxy formula to calculate the harm from the Basic and premium packages.

A second reason that the Court adjusted the proxy formula is consistency.  The Court had found that:  (1) the "Basic Package was of nominal value, absent the opportunity to earn money as a Mogul"; (2) at "least some of the Moguls would have purchased the Basic Package even if the Mogul Program had not existed"; (3) that evidence submitted by Defendants

6

in support of their argument that product packages were worth more than what BurnLounge charged for them was not "even remotely persuasive"; and (4) the Defendants' argument "that consumers primarily sought the value in the product packages" was unpersuasive.  Dkt. 431 at 7, 25.  If the Court had focused exclusively on non-Moguls who purchased a package as its comparison group for creating the proxy for the Basic package, the harm calculation would have been inconsistent with the foregoing findings.  This is true because the VIP and Exclusive Packages included every product in the Basic Package as if it were purchased separately.  *See id.* at 6 ("The Exclusive Package contained everything in the Basic Package plus . . . ."), 7 ("The VIP Package contained everything in the Basic and Exclusive Packages plus . . . ."); *cf. id.* at 26 ("The non-Mogul purchases of the VIP Package are included because that package included every product in the Exclusive Package as if it were purchased separately.")  As a result, all non-Moguls who purchased any package also purchased the Basic Package by definition.[5]  Therefore, the percentage of non-Moguls who purchased any package who also purchased the Basic Package is 100%.  Use of this tautology as a proxy for the behavior of Moguls would therefore have been meaningless and completely at odds with the Court's findings listed above because it would suggest that 100% of Basic package purchasers made the purchase because of perceived value.

### 4. The District Court's calculations reasonably followed BurnLounge's own chosen business record keeping structure.

Defendants' fourth argument criticizing the Court's calculation of harm from sales of Basic packages is that it was unreasonable for the Court to apply

---

[5]  Defendants' calculation of harm from the Basic package, which purports to use a formula similar to that used to calculate harm from the sales of premium package, shows harm from sales of Basic packages as $550,054.  Dkt. 560 at 14 n. 14.  The calculation is erroneous because it ignores the fact that by definition 100% of non-Mogul package purchasers also purchased the Basic package.  In fact, following Defendants' approach, no harm would be calculated:  53,234 Moguls $\times$ $29.95 $\times$ (100% - 100%) = 0.

7

1    the same formula to the three groups of Moguls, who purchased different

2    levels of product packages.  Plaintiff understands Defendants' argument to be

3    that it was unreasonable to calculate the harm for the purchase of the Basic

4    package to be the same whether the purchaser bought only the Basic package

5    or one of the premium packages.  The Court should reject Defendants'

6    argument for at least three reasons.  First, as conceded by Defendants,

7    BurnLounge "tracked its revenue for internal accounting purposes" by

8    dividing data by incremental income ($29.95, $100, and $300) earned at each

9    package price point (Basic - $29.95, Exclusive - $129.95, and VIP - $429.95).

10   Dkt. 560 at 5 n. 7.  The Court calculations followed the data as it was

11   maintained in the BurnLounge's business records.  Second, the Ninth Circuit

12   has already affirmed this approach with regard to the calculation of harm

13   flowing from the sale of the Exclusive package.  *BurnLounge*, 2014 U.S. App.

14   LEXIS 12685, at *5.  The Court used the same formula to calculate injury

15   flowing from the purchase of the Exclusive package whether the Mogul

16   purchased the Exclusive or the VIP because the Exclusive package was part of

17   the VIP package.  *See* Dkt. 431 at 7 ("The VIP Package contained everything

18   in the Basic and the Exclusive Packages . . . .")  Similarly, as to the Basic

19   package, the Court used the same formula to calculate injury flowing from the

20   purchase of the Basic whether the Mogul purchased it alone or as part of the

21   Exclusive or VIP packages.  The Court should reject Defendants' attack on

22   the logic of the Court's calculation of harm from sales of the Basic package

23   because the Ninth Circuit already affirmed use of a similar method of

24   estimation. *BurnLounge*, 2014 U.S. App. LEXIS 12685, at *5.

25        The third reason for rejecting Defendants' argument is that the sole

26   support they offer is the "Basic Package Moguls are qualitatively and

27   significantly differentiated from Moguls who bought a premium package in a

28   way that is directly relevant to the quantification of consumer harm that being

8

the extent that the Mogul's purchase was motivated by the business opportunity." Dkt. 560 at 15.   Defendants fail to recognize that the Court's chosen method for estimating harm to Moguls was to use non-Mogul behavior as a proxy for what Moguls would have done absent the Mogul program.  The Ninth Circuit has already affirmed this type of approach as to the premium packages. *BurnLounge*, 2014 U.S. App. LEXIS 12685, at \*5.  As a result, Defendants' contentions about the motivation of Moguls when the Mogul program was present do not address the Court's chosen method of calculation, which assumes the absence of the Mogul program.

**B.     DIRECTION 2:  "[T]he district court [should] explain the 'BurnLounge Presents' fee portion of the consumer harm calculation." *BurnLounge,* 2014 U.S. App. LEXIS 12685, at \*6.**

It is clear that the Ninth Circuit's remand only asked the Court to clarify *how* it calculated consumer harm from BLP fees.  Despite the clearly limited nature of the remand on this issue, Defendants nonetheless argue that the Court should completely redo its calculation.  Defendants' arguments on this point should not be considered for the basic reason that they are beyond the scope of remand.  "[A] district court is limited by [the Court of Appeals]'s remand in situations where the scope of the remand is clear." *See Mendez-Gutierrez v. Gonzales*, 444 F.3d 1168, 1172 (9th Cir. 2006) (citing, *inter alia*, *United States v. Pimentel*, 34 F.3d 799, 800 (9th Cir. 1994)).

Moreover, contrary to Defendant's claim, the Court should not have reduced its harm calculation for BLP fees made after April 2007 merely because the Court made this type of adjustment to its harm estimate for sales of the Basic package.  In fact, the Court adjusted the harm calculation for the Basic package after mid-April 2007 because BurnLounge offered free BurnPages "separate from the Basic Package." Dkt. 431 at 25.  As a result, there was a free alternative to the Basic Package.  In comparison, no free

1    version of the BLP existed, and there is no basis for the adjustment sought by
2    Defendants.  In other words, even after mid-April 2007, purchasers of
3    Exclusive and VIP packages would still be paying $8 per month for BLP, and
4    thus the Court was correct to include these in its harm calculation

5          Nor are Defendants entitled to any additional credit for the perceived
6    value of the BLP.  In fact, the Court has already estimated the value of the
7    BLP through its harm calculation. The Court only attributed harm to 65.5% of
8    those fees.  Following the Court's implicit logic, the other 34.5% of the fees
9    would have been paid absent the Mogul program and would have been for
10   value.  Thus, the Court has given credit for estimated value.  Defendants'
11   attempt to reopen litigation on this thoroughly litigated and previously
12   decided issue – in which they already received relief – should be denied.

**III.   Conclusion**

14         The parties already undertook substantial discovery.  Defendants
15   presented evidence on the value of their packages as a central issue of the
16   trial.  The parties sifted the evidence and thoroughly briefed the issue.
17   Following that, the Court decided that Defendants' contention that the value
18   of the packages exceeded the prices charged for them was not "even remotely
19   persuasive."  Dkt. 431 at 7.   Using the evidence, the Court made its own
20   findings about the harm Defendants caused through their unlawful conduct.

21         Now, Defendants essentially seek reconsideration of the Court's
22   affirmed Statement of Decision, arguing the Court should reopen discovery
23   and conduct an additional evidentiary hearing on the grounds that "the parties
24   did not take discovery or present evidence on the components of the
25   mathematical formulas used by the Court."  Dkt. 560 at 1.  But Defendants'
26   own brief, which attaches discovery, trial transcripts, and trial exhibits, shows
27   their contention is without substance.  Instead, the brief shows that these
28   issues were fully raised before the trial court, which considered all of this

1  evidence before issuing a decision that was upheld in all but the most minor
2  respects by the Court of Appeals.  For these reasons, there is no question of
3  fairness or due process that could justify any further discovery or hearings.
4  The Court should reject Defendant's attempt to prolong this litigation even
5  further and enter the FTC's proposed response to the Court of Appeals in
6  order to provide final resolution of all the appealed issues.

7                                    Respectfully submitted,

8
9  DATED:  August 14, 2014          Jonathan E. Nuechterlein
                                    General Counsel
                                    By /s/ Chris M. Couillou
10                                   Chris M. Couillou
                                    Attorney for Plaintiff FTC
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2

3      I, Chris M. Couillou, hereby certify as follows:

4         1.     I am an attorney employed by and representing the Federal

5  Trade Commission.  I am not a party to this action.

6         2.     On August 14, 2014, I served the foregoing document and

7  a Declaration of Chris M. Couillou, dated August 13, 2014,  on interested

8  parties in this matter by causing a true and correct copy to be filed

9  electronically via the CM/ECF system and mailed, postage prepaid, United

10  States first class mail and emailed to the following:

11         Mr. Rob DeBoer
         500 Harbison Blvd. #603
12         Columbia, SC 29212
         [Email:  coachrobdeboer@gmail.com]
13

14
      I hereby certify that the foregoing is true and correct.  Executed on this
15
  14th day of August, 2014, at Atlanta, Georgia.
16

17                         /s/ Chris M. Couillou
                        Chris M. Couillou
18

19

20

21

22

23

24

25

26

27

28